UNITED STATES of America

v.

MEDICA–RENTS CO., et al.

and

The United States of America ex rel. Ramon B. Carter and Michael Stockham

v.

Medica–Rents Co., et al.

No. CIV.A.4:00–CV–483–Y, CIV.A. 4:01–CV–198–Y.

United States District Court, N.D. Texas, Fort Worth Division.

Sept. 23, 2003.

Robert J McAuliffe, U.S. Dept of Justice, Washington, DC, Thelma Quince Colbert, U.S. Attorney's Office, Fort Worth, TX, Michael F Hertz, U.S. Dept of Justice, Civil Division, Polly A Dammann, U.S. Dept of Justice, Civil Division, Washington, DC, for United States of America.

Duff Westbrook, Sanders & Westbrook, Albuquerque, NM, David R. Childress, Whitaker Chalk Swindle & Sawyer, Fort Worth, TX, for Michael Stockham, Ramon B. Carter.

Howard J Young, Sonnenschein Nath & Rosenthal, Lisa A Estrada, Sonnenschein Nath & Rosenthal, Diana L Schad, Mintz Levin Cohn Ferris Glovsky & Popeo, Washington, DC, Hugh Carter Burdette, Cantey & Hanger, J Frank Kinsel, Jr, Cantey & Hanger, Fort Worth, TX, Jefferson M Gray, Arent Fox Kintner Plotkin & Kahn, Washington, DC, Sidney T Lange, Cantey & Hanger, Fort Worth, TX, Susan

L Burke, Montgomery McCracken Walker & Rhoads, Timothy J Kepner, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, for Medica Rents Co Ltd., Richard F Walsh.

Howard J Young, Sonnenschein Nath & Rosenthal, Diana L Schad, Mintz Levin Cohn Ferris Glovsky & Popeo, Washington, DC, Hugh Carter Burdette, Cantey & Hanger, J Frank Kinsel, Jr, Cantey & Hanger, Fort Worth, TX, Jefferson M Gray, Arent Fox Kintner Plotkin & Kahn, Washington, DC, Susan L Burke, Montgomery McCracken Walker & Rhoads, Timothy J Kepner, Montgomery McCracken Walker & Rhoads, Philadelphia, PA, for Anna Jean King Walsh, The Amy Suzanne Walsh 1987 Trust, The Ellen King Walsh 1987 Trust, The Holland Fleming Walsh 1987 Trust, Med Rco Inc.

R H Wallace, Jr., Shannon Gracey Ratliff & Miller, Fort Worth, TX, for Crown Therapeutics Inc., ROHO Inc.

*ORDER PARTIALLY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING THE UNITED STATES'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

MEANS, District Judge.

Pending before the Court are two motions: (1) defendants' Motion for Summary Judgment [doc. # 277–1], filed November 15, 2002; and (2) plaintiff United States of America ("United States")'s Motion for Partial Summary Judgment [doc. # 272–1], filed November 18. Having carefully considered the motions, responses, replies, and supplemental information, the Court concludes that the United States's motion should be DENIED and the defendants' motion should be PARTIALLY GRANTED.

## I. RELEVANT BACKGROUND

On February 17, 1998, relators Ramon B. Carter and Michael Stockham filed a *qui tam*[1] suit against the defendants in the United States District Court for the District of New Mexico, alleging violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the relators' suit").[2] Specifically, the relators claimed that between 1994 and 1996 the defendants knowingly over-billed the Medicare program for an anti-bedsore device known as the ROHO Mattress Overlay. On June 5, 2000, the United States filed a complaint in this Court, which was given the style and number set out above, alleging various claims against the defendants, including claims for common-law unjust enrichment and payment by mistake. Thereafter, on February 23, 2001, the United States District Court for the District of New Mexico transferred the relators' suit to this Court. In an order dated April 11, this Court consolidated the relators' suit with the suit filed by the United States. Thereafter, on August 18, 2002, the Court granted the United States's motion to intervene into the relators' suit.

The defendants, in their motion, seek summary judgment on all claims against

---

1. "The phrase 'qui tam' is a shortened version of the Latin phrase, 'qui tam pro domino rege, quam pro se ipso in hac parte sequitar,' meaning 'who prosecutes this suit as well for the king, as for himself.'" *United States ex rel. Garibaldi v. Orleans Parish Sch. Brd.*, 21 F.Supp.2d 607, 609 (E.D.La.1998). Thus, a *qui tam* action is brought by a private individual on the government's behalf. *Id.*

2. The relators, in their most recent complaint, allege that the defendants violated three provisions of the False Claims Act ("FCA"): (1) section 3729(a)(1), knowingly presenting a false or fraudulent claim for payment or approval; (2) section 3729(a)(2), knowingly making or using a false record or statement to get a false or fraudulent claim paid by the government; and (3) section 3729(a)(3), conspiring to defraud the government by getting a false or fraudulent claim paid.

them. The United States, in its motion, seeks summary judgment only on its claims for common-law payment by mistake and partnership liability.

A. Overview of the Medicare Program

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ggg, establishes the Health Insurance for the Aged and Disabled Program, which is commonly known as "the Medicare program" or, just "Medicare." Medicare is administered by the Secretary of the United States Department of Health and Human Services ("the HHS") through the Health Care Financing Administration ("the HCFA").[3] Medicare is comprised of two parts, Part A, which is not at issue in this case, and Part B, which provides federal government funds to help pay for, among other things, certain durable medical equipment ("DME")[4] and supplies for Medicare beneficiaries. Part B is funded by the United States and by insurance premiums that are paid by enrolled Medicare beneficiaries. Eligible individuals who are age 65 or older or disabled may enroll in Part B to obtain benefits in return for payments of monthly premiums.

The United States provides reimbursement for Medicare claims through the HCFA. The HCFA, in turn, contracts with private insurance carriers to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund. In this capacity, the carriers act on behalf of HCFA. Prior to 1993–94, nearly three dozen different local Medicare carriers had the responsibility for processing DME reimbursement claims. As a result of this multiplicity of carriers, significant disparities developed over time between the various carriers' medical policies and coverage criteria for particular DME items.

In 1993, the HCFA, in an effort to promote greater uniformity and consistency in DME reimbursement, consolidated the responsibilities for DME reimbursement into four regional carriers, called the Durable Medical Equipment Regional Carriers ("the DMERCs"). In addition to creating the four DMERCs, the HCFA also established the Statistical Durable Medical Equipment Regional Carrier ("the SADMERC") to assist the DMERCs. The SADMERC's function[5] was to coordinate the coding decisions by the four DMERCs to ensure that they were consistent across the country.[6]

The Medicare Region C[7] DMERC was Blue Cross/Blue Shield of South Carolina,

---

3. In 2001, HCFA renamed itself the Center for Medicare and Medicaid Services.

4. DME is "equipment furnished by a supplier or a home health agency that—(1) Can withstand repeated use; (2) Is primarily and customarily used to serve a medical purpose; (3) Generally is not useful to an individual in the absence of an illness or injury; and (4) Is appropriate for use in the home." 42 C.F.R. § 414.202 (2003).

5. The SADMERC was also charged with collecting statistical and other information and disseminating it to the four DMERCs. According to Laura Godfrey, manager of the HCPCS unit at SADMERC, the SADMERC had no authority to determine how suppliers filed their claims or what the DMERC did with the claims once they were received. (Defs.' App. at 189.)

6. However, according to Bernard Patashnik, one of the defendant's experts, the SADMERC was not the sole source for coding advice, and suppliers commonly relied on the DMERCs' Professional Relations Departments and ombudsmen when they had questions about billing and coding. (Patashnick Dep.; Defs.' App. at 588.) In addition, when the SADMERC was first created, suppliers expressed some confusion over SADMERC's purpose and role. (Geddings Dep.; Defs.' App. at 175.)

7. Region C included all states in which Medica–Rents did business.

which does business under the name of Palmetto Government Benefits Administrators ("Palmetto"). In addition, HCFA awarded Palmetto the contract to act as the SADMERC for all four DMERC regions. The contract between HCFA and Palmetto, which was effective January 1, 1993, stated:

> "The SADMERC shall perform the following tasks: ... Operate a [Health Care Procedure Coding System ("HCPCS") Hotline] ... to provide [Durable Medical Equipment, Prosthetics, Orthotics, and Supplies] coding advice (as agreed upon by all 4 DMERCs). The SADMERC will provide coding guidance to ... suppliers ... and all other callers during the year. The SADMERC will develop coding advice in conjunction with all the 3 other DMERCs. All coding guidance must be reflective of all the DMERCs. If necessary, request supporting documentation and consult the medical director's workgroup. For example, if a supplier calls to ask how a given device should be coded, the SADMERC must contact the other 3 DMERCs and reach consensus (if possible) on how the item should be coded. The SADMERC must then provide this coding advice to the supplier. In those rare instances where the DMERCs are unable to reach consensus, the SADMERC must inform the supplier how to code in each region."

(Pls.' App. at 641–43.) In addition, in its September 1993 Supplier's Manual, Palmetto stated:

> Palmetto Government Benefits Administrators has implemented a Total Quality Environment (TQE) team approach to its claims processing and customer service areas. Medicare receives inquiries through telephone calls, written correspondence and personal interviews. Dedicated Work Teams have been developed to handle claims from start to finish, including all of the various types of pre-payment and post-payment inquiries.
>
> Teams provide productive and satisfying ways to manage work. Processing a claim involves much more than making coverage determination, data entry and pricing. It also includes determining if other insurance is involved, answering telephone and written inquiries, processing adjustments, appeals, overpayments, as well as initiating medical reviews. Our dedicated work teams have been developed to complete all of these tasks.
>
> **What does this mean to you, the supplier? When you need to communicate with Palmetto GBA you will contact the team assigned to you. This puts you in contact with the team that is familiar with your Medicare billing needs. This team concept fosters communication and a more direct relationship between suppliers and the DMERC, promoting a higher quality of service to you. You have the opportunity as a supplier to get to know the individuals who have taken responsibility for your claims and inquiries.**
>
> . . . .
>
> All incoming calls from beneficiaries and suppliers are handled by the Dedicated Work Teams. The team members answer coverage questions and specific questions regarding claim disposition. . . .
>
> **Our team members can help you with coding and billing questions, allowed charge amounts, and medical coverage criteria.**

(Region C DMERC Supplier Manual at 9.1 (emphasis added); Defs.' App. at 111, 114.)

In order for a DME supplier to obtain reimbursement, the supplier must comply with certain statutes, regulations, and guidelines. A DME supplier has a duty to familiarize itself with these statutes, regulations, and guidelines. In addition, a

DME supplier must meet certain obligations, including not making false statements or misrepresentations of material facts, to receive payment from HCFA. In order to obtain reimbursement, a DME supplier is required to provide certain information to HCFA on a form called the HCFA 1500 form. This form, in box 24d, requires a DME supplier to identify its products using a coding system known as the Healthcare (formerly HCFA) Common Procedure Coding System (HCPCS) for DME products.

## B. HCPCS Codes

HCPCS is a national coding system used by Medicare and private insurers. Because of the large number of DME products reimbursed by Medicare, HCFA created the HCPCS as a shorthand way of communicating to the carrier what item or service has been furnished to the Medicare beneficiary. The purpose of the HCPCS codes is to put structurally and functionally similar products together into categories, and products are assigned to codes based upon their characteristics. The HCPCS is maintained by a panel, known as the HCPCS Alpha–Numeric Editorial Panel ("the HCPCS Panel"), that decides whether a new code should be created for a type of DME product or whether a DME product fits within an existing code. The HCPCS Panel is made up of representatives from HCFA, the Blue Cross and Blue Shield Association, and the Health Insurance Association of America. Within HCFA, a group known as the Alpha–Numeric Workgroup formulates HCFA's policies regarding HCPCS codes and makes coding recommendations to the HCPCS Panel.

Each HCPCS code used to identify rented DME is assigned a monthly reimbursement amount, also called an allowable or a fee schedule amount, on a state-by-state basis. Each HCPCS code for a DME has a descriptor that describes a category of DME products. DME products with characteristics matching a HCPCS code descriptor are billed to Medicare under that code. DME products with characteristics that do not match the descriptor of a specific HCPCS code are billed using code E1399, which has a descriptor that states "DME, Miscellaneous, not elsewhere classified." The amount of reimbursement for DME coded E1399 is based upon the carrier's or the DMERC's analysis of the specific product.

## C. Medica–Rents and the HCPCS Codes

Defendant Medica–Rents is a family-owned partnership headquartered in Fort Worth, Texas, that has been engaged in the business of renting DME to hospitals, nursing homes, and individual patients since 1966.[8] The other defendants are either general or limited partners of Medica–Rents.[9]

---

**8.** From 1991–95, Dennis Dees was Medica–Rents's general manager, Deborah Craig was its office manager, and Karen Mayes was its assistant office manager. Craig and Mayes were the employees principally responsible for billing matters.

**9.** Defendant Richard Walsh is currently a limited partner of Medica–Rents, owning 8.5% of Medica–Rents. He is also the president, sole officer, and registered agent of defendant Med–RCO, Inc. From 1987 through December 1995, Walsh was the managing general partner of Medica–Rents. Defendant Anna Jean King Walsh is currently a limited partner of Medica–Rents, owning 9.5% of Medica–Rents. From 1987 through December 1995, Anna Jean King Walsh was a general partner of Medica–Rents. Defendants The Amy Suzanne Walsh 1987 Trust, The Ellen King Walsh 1987 Trust, and The Holland Fleming Walsh Trust are all limited partners of Medica–Rents, each owning 27% of Medica–Rents. Defendant Med–RCO, Inc. is a Texas for-profit corporation, owning 1% of Medica–Rents, and has been the general partner of Medica–Rents since January 1996.

From 1991 through 1996, Medica–Rents rented a support surface known as the ROHO Mattress Overlay [10] to Medicare beneficiaries.[11] The ROHO Mattress Overlay is a non-powered, mattress overlay flotation-therapy device that is placed on top of a standard hospital mattress to aid in the prevention and healing of pressure ulcers or bed sores.

In 1991 and 1992, ROHO, Inc. applied with the HCFA for a new HCPCS code for the ROHO Mattress Overlay because ROHO, Inc. believed that there was no existing HCPCS code that applied to the product. In its May 9, 1991, application, ROHO, Inc. submitted twelve pages of detailed information on the ROHO Mattress Overlay. In December 1992, the HCFA initially declined to recommend a new code for the ROHO Mattress Overlay, suggesting that it was already adequately described by code E0197 ("air pressure pad for mattress"). (Pls.' App. at 449.) In his deposition, Jonathan McCausland, the administrative manager for Crown Therapeutics/ROHO, Inc. and the former committee chairman of the Health Industry Manufacturers Associations's Support Surface Task

Force, testified that ROHO, Inc. was also "advised that the opinion of the [HCPCS Panel] was that it was an opinion, and that [ROHO, Inc.] could—that the local carriers had full right and authority to make their own determinations based on their particular observations or decisions." [12] (McCausland Dep.; Defs.' App. at 470.) In addition, because code E0197 applied to a simple mattress product and paid a very minimal reimbursement rate, ROHO, Inc., in a letter dated February 20, 1992, protested and appealed the HCFA's determination. (Pls.' App. at 450–55.)

In April 1992, Medica–Rents sent a letter, apparently to various Medicare carriers, emphasizing the benefits of the ROHO Mattress Overlay and requesting the creation of a new HCPCS code for the overlay. (Pls.' App. at 457–60.) Medica–Rents believed that the characteristics of the ROHO Mattress Overlay did not match the descriptor of any existing HCPCS billing code. (Pls.' App. to Resp. at 514–16; 578.) In July 1992, Charles Spalding of the HCFA sent a note to Charles R. Booth [13] that stated:

**10.** This mattress overlay was manufactured by ROHO, Inc. Medica–Rents had partial exclusivity as the distributor for the mattress overlay in Texas, Arkansas, Oklahoma, Tennessee, and Louisiana.

**11.** The ROHO Mattress Overlay qualified for rental reimbursement under Medicare as a "capped-rental" item. Under the capped-rental regulations, the monthly payment amount is somewhat higher in the first three months. After ten months of rental, a supplier must provide a Medicare beneficiary with notice of his option of taking ownership of the item. If the beneficiary chooses not to take ownership, Medicare "caps" the rental fees paid to the item's supplier at the fifteenth month. Accordingly, the HCPCS codes used for capped-rental items had to track the number of months the product had been rented so the monthly rental fees could be adjusted and so that ownership could be transferred or the rental fees capped at the appropriate time.

See 42 U.S.C.A. § 1395m(a)(7)(A)(I) (West 2003); 42 C.F.R. § 414.229(b)(2) (2003); (Kaiser Dep.; Defs.' App. at 299–301.)

Since 1989, Medicare has reimbursed for DME products based on a "fee schedule" system. The HCFA fee schedule contains a dollar amount for each HCPCS code. Carriers utilized the HCFA fee schedule when determining how much to reimburse suppliers for particular products.

**12.** McCausland claims that Medica–Rents received this same information from Dr. Kay Jewell at the HCFA; Kaye Riley, who was secretary to the HCPCS panel; and/or Dr. Sam Shekar. (McCausland Dep.; Defs.' App. at 470.)

**13.** The Court is unsure of the identify of Charles R. Booth. From the informality of the note, the Court assumes that he was also employed with the HCFA.

ROHO, Inc. submitted a request for the addition of a level II (alpha-numeric) HCPCS code for its "dry flotation mattress system." On July 14, 1992, the HCPCS Alpha–Numeric Editorial Panel determined that a HCPCS code already exists that describes this item. The Panel initially believed, because of the presence of the words "dry" and "mattress" in the product name, that this item should be coded as an E0184 (dry pressure mattress). However, after further discussion and review of the information submitted by ROHO, the Panel was undecided as to whether this item should be coded as a pressure mattress or a pressure pad for mattress (mattress overlay). It was also unclear as to whether this item should be coded as a dry pressure device or an air pressure device. As a result, the Panel decided to postpone a final decision on this code request pending the outcome of a meeting (OCEP has tentatively scheduled the meeting for August 11) with ROHO to look at the item. Subsequently, a decision will be made as to the correct code to use in classifying this item.

We are not aware of any adjustment in payment for E0184 or any other pressure mattress code....

The upshot of all this is HCFA will probably consider this device to be an air pressure pad for **overlay** on a mattress (E0197), we will pay $166 for purchase in 1993 and ROHO will still want a new code and $4,000.

(Pls.' App. at 480 (emphasis added).)

After attending a complete demonstration of the ROHO Mattress Overlay and reviewing ROHO, Inc.'s application, HCFA's Alpha–Numeric Workgroup agreed with ROHO, Inc.'s request for the ROHO Mattress Overlay to remain unclassified and billed under code E1399.[14] (Pls.' App. to Mot. for Partial Summ. J. ("Pls.' App.") at 217–19.)

Before December 1993 (and prior to the consolidation of DME-reimbursement responsibility into the four regional DMERCs), Medica–Rents submitted claims for reimbursement for the ROHO Mattress Overlay to several carriers, including Blue Cross/Blue Shield of Texas. Beginning in December 1993, Medica–Rents submitted claims for reimbursement[15] under part B of the Medicare program to Palmetto Government Benefits Administrators ("Palmetto"), the Medicare Region C DMERC.

1. The ROHO Mattress System and Code E1399

Code E1399 is a miscellaneous HCPCS billing code that is used for a wide variety of medical products. According to Laura Godfrey, manager of the HCPCS unit at SADMERC[16] from 1993 to 1997, claims coded E1399 were administratively difficult for the carriers to process because every claim submitted had to be individually reviewed instead of processed electroni-

14. Joel Kaiser, the health insurance specialist at HCFA central in Baltimore, attended the demonstration. (Pls.' App. at 217.)

15. Medica–Rents submitted these claims under assignment-of-benefits agreements with the patients to whom it rented the ROHO Mattress Overlay. These agreements allowed Medica–Rents to bill Part B of the Medicare program directly.

16. As an HCPCS manager, her "primary responsibilities were to oversee the coordination of coding issues, to act as a conduit for coding issues for manufacturers back out to the four regional durable medical equipment carriers." (Godfrey Dep.; Defs.' App. at 176.)

cally. (Godfrey Dep.; Defs.' App. at 195–96.) The claims-processing problems associated with code E1399 appeared to be even more difficult when used with the ROHO Mattress Overlay because it was a capped-rental item and E1399 was not a capped-rental code. (Sherietta Thompson Dep.; Defs.' App. at 915; Godfrey Dep.; Defs.' App. at 198.) In other words, if code E1399 were used in billing for a capped-rental product like the ROHO Mattress Overlay, the carrier had to determine the appropriate reimbursement rate and manually track the number of months that payments had previously been made. (Godfrey Dep.; Defs.' App. at 198.)[17]

2. The ROHO Mattress Overlay and Code E0277

In November 1991, the HCPCS Panel approved a new capped-rental code, E0277, that had a descriptor of "Alternating Pressure Mattress" and became effective in January 1992.[18] (Kaiser Dep.; Defs.' App. at 304, 334–42; Pls.' App. at 448.) According to 21 C.F.R. § 880.5550 (2002), an "alternating pressure air flotation mattress is a device intended for medical purposes that consists of a mattress with multiple air cells that can be filled and emptied in an alternating pattern by an associated control unit to provide regular, frequent, and automatic changes in the distribution of body pressure." The device is used to prevent and treat decubitus ulcers (bed sores). According to the plaintiffs, in order to qualify as an alternating pressure mattress a product must be: (1) powered and (2) a mattress. (Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") at 11–12.)

In early 1992, HCFA discovered that some carriers were mistakenly billing under code E0277 for non-powered overlay products. (Pls.' App. to Resp. at 259–63.) In an effort to correct this error, Charles

17. With respect to these additional administrative burdens, the defendants state:
 Because of these additional administrative burdens and their impact on claims processing, carriers were understandably reluctant to use code E1399 for capped-rental items, as opposed to relying on an established capped-rental code. Godfrey Dep. at 123; Thompson Dep. at 92–03 (App. 198, 916). Claims processing efficiency meant more profit for the carrier, as well as ensuring more prompt payment of reimbursement to suppliers, a key consideration for HCFA in assessing the performance of its contractors. Metzger Dep. at 41; Schmidt Ex. 4 (app. 514, 774, 794–95). HCFA accordingly permitted both the local carriers and later the DMERCs to consider administrative efficiencies in making decisions about whether to process claims under E1399, as opposed to using an established capped-rental code. Schmidt Dep. 72–73; MRC 0017437; MRC 0017399 (App. 736–37; 972; 974). If another HCPCS code other than E1399 was appropriate for billing purposes, products could therefore be billed using that other code. Godfrey Dep. at 106 (App. 195).

(Defs.' Br. at 19.) Nancy Schmidt, Health Insurance Specialist in the HCFA Dallas Regional Office, also testified that the four DMERCs have the authority to reevaluate the correct code for a DME product, "but as those decision relate to HCPCS coding and . . . that part of changing their mind has to be also then coordinated with the SADMERC and the other three [DMERCs]. There has to be that relationship with the others . . .," and that such reevaluations had to be correct and could not violate HCFA instructions. (Pls.' App. to Resp. at 465–66.)

18. The plaintiffs state that government officials; the defendants' experts; Walsh; Dees; Shirley Dodson, director of coordinated services for Medica–Rents; Bob Pittman, Medica–Rents's district manager for Tennessee and Arkansas; and David Senseman, Medica–Rents's district manager for Alabama; knew that an alternating-pressure mattress was a powered mattress and that Medica–Rents knew in 1994 and 1995 that the ROHO Mattress Overlay was not an alternating-pressure mattress ("Pls.' Resp." at 2–3.)

Spalding of the HCFA, sent out a letter, dated April 24, to the "RO DME Contacts." The letter referred to several products that could be billed under code E0277.[19] (Pls.' App. to Resp. at 261.) The HCFA mistakenly included a low-air-loss mattress-system product in the list, even though it was not technically an alternating-pressure system. (Pls.' App. to Resp. at 261.) However, because they are similar products and both are powered, the HCFA ultimately decided to allow both types of products to be billed under E0277. (Pls.' App. to Resp. at 261.)

Section 15.40 of the July 1995 DMERC Region C Suppliers' Manual, which referred to several HCPCS codes relating to alternating pressure-pads or mattresses, including E0277, stated: "The alternating pressure pad fits on the existing mattress and adjusts automatically to changes in a patient's weight distribution." (Defs.' App. at 508.) Palmetto's September 1995 and April 1996 DMERC Medicare Advisory to its suppliers continued to describe code E0277 as an "alternating pressure mattress." [20] (Defs.' App. at 67, 466.) Effective January 1, 1998, the descriptor for code E0277 was apparently revised to "Powered Pressure–Reducing Air Mattress." (Defs.' App. at 728.)

### 3. Medica–Rents and the Local Carriers in 1992–93 [21]

In accordance with HCFA's instructions in 1992 that ROHO and its suppliers could approach individual carriers to seek authorization to use some code other than E0197 in submitting claims for the ROHO Mattress Overlay, ROHO, Inc. and Medica–Rents contacted a number of local carriers in 1992 to determine whether they

---

**19.** The letter stated that "[i]t must be verified with each carrier in your region that their fee schedule amounts for E0277 were established based on pricing for alternating pressure mattress systems (i.e., alternating pressure mattress plus pump.)" (Pls.' App. to Resp. at 560–569.)

On April 28, HCFA's regional office in Atlanta specifically instructed Blue Cross and Blue Shield of South Carolina (which later created Palmetto to perform as DMERC Region C) that fee-schedule amounts for code E0277 must be "established based on pricing for alternating pressure mattress systems (i.e., alternating pressure mattress plus pump)." (Defs.' App. to Resp. at 570–72.)

**20.** Palmetto's advisories expanded the definition of code E0277:

Code E0277 describes a powered pressure reducing mattress (alternating pressure, low air loss, or powered flotation without low air loss) which is characterized by all of the following:

1) An air pump or blower which provides either sequential inflation and deflation of the air cells or a low interface pressure throughout the mattress, and

2) Inflated cell height of the air cells through which air is being circulated is 5 inches or greater, and

3) Height of the air chambers, proximity of the air chambers to one another, frequency of air cycling (for alternating pressure mattresses), and air pressure provide adequate patient lift reduce pressure and prevent bottoming out, and

4) A surface designed to reduce friction and shear, and

5) Can be placed directly on a hospital bed frame.

(Defs.' App. at 67, 466.)

**21.** According to the defendants, between 1991 and April 1996, HCFA and its authorized local and regional Medicare carriers at various times either advised that the following billing codes applied to the ROHO Mattress System, or changed claims submitted for the ROHO Mattress System under another code to one of these codes: E0184 (dry pressure mattress); E0186 (air pressure mattress); E0190 (local Arkansas code for air pressure mattress); E0196 (gel pressure mattress); E0197 (air pressure pad for mattress); E0199 (dry pressure pad for mattress); E1399 (DME, miscellaneous); and E0277 (alternating pressure mattress). (Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") at 4–5)

would approve the use of another billing code, such as E1399 or E0277. Theses inquiries produced a wide variety of responses.[22] For example, Pittman received a letter dated June 1, 1992, from Connecticut General Life Insurance Company, the Medicare provider in Tennessee, that stated, "After much research and investigation of other carriers, we have concluded that your item would be code[d] E0197, Air Pressure Pad for a Mattress." (Defs.' App. at 461.) Furthermore, in a letter written on August 2, 1993, to Paul Metzger, DMERC Medical Director of Region A, Robert Graebe, president of ROHO, Inc. stated that "[c]urrently the ROHO Mattress System is being reimbursed by the Kentucky Medicare under code E0277, at approximately $603.66 per month. It was the decision of representatives of the Kentucky carrier, after evaluation of the product, that the ROHO Mattress System was the therapeutic equivalent to other products within that category and that it did qualify for reimbursement under the code." [23] (Defs.' App. at 518.) In addition,

22. In a letter dated May 30, 1992, to Donald Sundquist, a U.S. congressman from Tennessee, Robert Pittman, District Manager of Medica–Rents, wrote:

> The nightmare has been brought about by a HCFA rules change effective 5–1–92 requiring us to file for reimbursement on our product within the state where the beneficiary resides. This change affected us by virtue of the fact that we have been filing and receiving reimbursement for the past four years for all of the nine states in which we operate through Medicare/Texas where our home office operations are based.
>
> We have petitioned the other eight states for immediate consideration because of the fact that we have over $5,000,000.00 invested in the products that are currently in use and our cash flow on these products outside the state of Texas now stands at –0–. . . .
>
> The reason we need your help stems from our frustration with trying to get anywhere considering the dysfunctional state of affairs at HCFA and the disarray and confusion that exist among both HCFA and the intermediaries. Over the past six weeks we have devoted more than two thousand hours of staff and management time attempting to work through the maze of "provider services" at each of the eight intermediaries. Each state required us to jump through a different set of hoops which we gladly did. We were told a different story in each state with our reimbursement coming from totally different codes including E1399, E0190, E0196, E0197 and E0277. The reimbursement amount varied from – 0– to $814.00 per month. Finally last week were told that all of HCFA/Medicare Region 4 (Tennessee, North Carolina, South Carolina, Kentucky, Georgia, Florida, Alabama, Mississippi) would get together and determine a rate to be used in those states. They did what they said they would and referred to a HCFA/Baltimore policy statement made in July 1991 which allowed for the ROHO mattress system to be reimbursed under existing HCFA code E0190 with an allowable rate of $26.00 per month.
>
> . . . .
>
> Enclosed are results of several Medicare hearings that state that no existing HCPC code accurately describes the ROHO mattress system. We agree with those findings and are seeking reimbursement under the miscellaneous code 1399 until such time that a code is developed which accurately describes the system and provides a fair and reasonable reimbursement for the provider of $500 to $600 per month.
>
> There has been some interest in reimbursing the ROHO system under E0277 which provides $700 to $800 per month in funding but severely restricts the type of patients that the products can be used on to those patients that have already reached an acute level of bedsore severity. . . .

(Defs.' App. at 158–59.)

23. The plaintiffs claim that Walsh knew that this determination by the Kentucky local carrier was "neither appropriate nor reliable." (Pls.' Resp. at 11.) The plaintiffs state:

> In 1992, the Kentucky Medicare carrier allowed Crown/ROHO, Inc. to submit claims for the ROHO Mattress Overlay under code E0277 because the carrier believed that the ROHO Mattress Overlay "was the therapeutic equivalent to other products within that category . . . ." App. to Def. Mem. 518 (Metzger Dep. Ex. 1, August 2, 1993 letter

the Florida carrier advised Medica–Rents to use code E0184,[24] Blue Cross/Blue Shield of Arkansas advised Medica–Rents to use code E0190,[25] Blue Cross/ Blue Shield of· Alabama advised Medica–Rents to use code E0197 in June 1992;[26] Louisiana Medicare Services initially used E1399 and later authorized billing under E0277 in October 1993.[27]

In addition, during the 1992–through–1993 period, there appears to have been widespread uncertainty throughout the industry over what products fell within the new E0277 code. (Defs.' App. at 243, 318–27.) In his deposition, Kaiser, of the HCFA, admitted that "there was confusion within HCFA and among the DMERCs over what types of support surfaces could be coded under E0277 in the 1993 to 1995 time period." (Defs.' App. at 316.) However, Kaiser also testified that the HCPCS panel never determined that E0277 was the correct code to use for the ROHO Mattress Overlay. (Defs.' App. at 316.) Furthermore, in June 1994, the HCFA stated in response to a support-surface

manufacturer's inquiry that it was unable to provide a definition for code E0277 and that the DMERC medical directors were attempting to establish a new medical policy for support surfaces that would better define this code. (Defs.' App. at 222–23.) Furthermore, other manufacturers of support-surface products expressed concerns over what products could be coded E0277 and the inconsistent changes in the use of code E0277 that were occurring. (Defs.' App. at 225–26; 975–77.) In late 1995, the HCFA established a new descriptor and definition for code E0277, "Powered Pressure–Reducing Air Mattress," which became effective on January 1, 1996. (Defs.' App. at 67–68; 462–67; *see also* Defs.' App. at 728.)

The plaintiffs claim that "[s]ince 1992, Walsh and former Medica–Rents general manager Dennis Dees knew that code E0277 did not apply to the ROHO Mattress Overlay, and that the correct code for Medicare claims for the ROHO Mattress Overlay until April 1996[28] was code E1399." (Pls.' Resp. at 4.) To support this position, the plaintiffs rely on the deposition testimony of Shirley McAdoo,[29] Rob-

---

from ROHO, Inc. to Dr. Metzger). However-er, permitting a product to be billed under a code because it provides the "therapeutic equivalent to other products within that category" is not appropriate; therapeutic value plays no role in the determination of the appropriate billing code, as defendants knew. App. 388–389; 392 (3/25/02 Metzger Tr. at 172–73; 179); App. 553; 554–555; 556–557 (2/26/02 Wilhelm Tr. at 44; 52–53; 66–67); App. 79–83 (11/8/02 Cohen Tr. at 64–68); Facts Section III.A., III.B., III.C., above. (Pls.' Resp. at 11.)

24. In a letter dated May 29, 1992, to Dennis Dees, general manager of Medica–Rents, Louise Beckom wrote that the "Carrier's medical consultant advises the item should be reported using procedure E0184—Dry pressure mattress." (Defs.' App. at 826.)

25. (Senseman Dep.; Defs.' App. at 824, 827.)

26. (Pls.' App. to Resp. at 573.)

27. In a letter dated October 22, 1993, to Medica–Rents, the Louisiana Medicare Carrier stated:

We have found more can be allowed on the services. More is being allowed because more data was received. You will receive an explanation of medicare benefits/remittance advice soon.

The procedure code for this service, E1399 and E0192, was changed to code E0277, in order to allow payment.

The allowed amount for this item was based on the [DME] fee schedule.

(Defs.' App. at 168.)

28. In April 1996, the new support-surfaces policy became effective, which established a new HCPCS code for the ROHO Mattress Overlay, K0413.

29. Shirley McAdoo, the director of coordinated services for Medica–Rents in 1991 and 1992, was instrumental in Medica–Rents's efforts to obtain a specific HCPCS code for the ROHO Mattress Overlay. (Pls.' App. to Resp.

ert Pittman,[30] and David Senseman.[31] The plaintiffs also allege that Walsh attempted to hide this knowledge during discovery.[32] (Pls.' Resp. at 4.)

at 424.) She testified in her deposition that in 1992 Walsh's strategic plan was to obtain approval for using code E0277 for the ROHO Mattress Overlay. (Pls.' App. at 381.) She also testified that Walsh stated:

> We have got to get E0277. It fits. This mattress clearly fits with E0277. We just can't get Medicare to listen to us, and for them to approve E0277. That they [Medicare] don't know what they are doing and you know, we are being scammed, basically.

(Pls.' App. to Resp. at 347.) She stated that Walsh and Dees asked her to seek approval from the Medicare carrier in Arkansas for Medica–Rents to use code E0277. (Pls.' App. to Resp. at 345.) She claims that the Arkansas carrier refused to allow Medica–Rents to bill for the ROHO Mattress Overlay under code E0277 because it was not mechanized. (Pls.' App. to Resp. at 347–48.) She stated that she relayed this information to Walsh and Dees (Pls.' App. to Resp. at 348) and that Walsh became very frustrated and angry. (Pls.' App. to Resp. at 353–55.)

McAdoo further testified that Walsh asked her "what would keep him from just going ahead and billing" E0277. (Pls.' App. to Resp. at 358.) McAdoo stated that she told him that "[t]hat's not the way it is done" and that Walsh responded by saying "I can do whatever I want. It's my company." (*Id.*) McAdoo also testified that Walsh told her that Medica–Rents could not survive without using code E0277 and that he was well-connected politically. (Pls.' App. to Resp. at 352–53.) She also stated that she was not aware of Medica–Rents's doing anything improper or inappropriate in seeking to obtain code E0277 from the Medicare carriers. (Pls.' App. to Resp. at 382.)

**30.** Pittman was Medica–Rents's district manager for Tennessee and Arkansas from 1987 through August 1993. (Pls.' App. to Resp. at 406.) He testified that in April and May 1992, Walsh and Dees instructed him to ask the Medicare carrier in Tennessee for authority to use code E0277 when billing for the ROHO Mattress Overlay. (Pls.' App. to Resp. at 411–15.) Pittman claims that Walsh's goal was to obtain a Medicare rental allowable for the ROHO Mattress Overlay of $450 per month. (Pls.' App. to Resp. at 432–36, 448.)

Pittman further testified that he learned in 1992 that E0277 was for powered products and that Walsh and Dees knew in 1992 that the ROHO Mattress Overlay was not a powered product. (Pls.' App. to Resp. at 438–40.) Pittman claims that he told Walsh and Dees in 1992 that Medicare would not allow Medica–Rents to use E0277 for the ROHO Mattress Overlay because it was not a powered product. (Pls.' App. to Resp. at 430–32, 438–40.) Pittman stated that, in June 1992, he understood that no Medicare carrier agreed with Walsh's argument that the ROHO Mattress Overlay could be billed under E0277 just because it provided the same therapeutic performance as products billed under E0277. (Pls.' App. to Resp. at 438–39.) Pittman also testified that by April 1993 he understood that if there was no specific code that fit the ROHO Mattress Overlay, then it should be billed under E1399 and that he relayed this information to Walsh and Dees. (Pls.' App. to Resp. at 420–21, 444–47.)

**31.** Senseman was Medica–Rents's district manager for Alabama from 1987 through 1992. He testified that in April 1992, he was instructed by Dees to ask the Medicare carrier in Alabama for authority to use code E0277 when billing for the ROHO Mattress Overlay. (Pls.' App. to Resp. at 473.) Senseman testified that in 1992, he and Dees learned that E0277 was for motorized (powered products) and that they knew that the ROHO Mattress Overlay was not a powered product. (Pls.' App. to Resp. at 481–82, 487–88.) He stated that in 1992, the Alabama Medicare carrier refused to allow Medica–Rents to use E0277 when billing for the ROHO Mattress Overlay. (Pls.' App. to Resp. at 475, 573.)

**32.** The plaintiffs state:

> During discovery in this case, defendants failed to disclose the activities, advice, documents, and even identifies of three former employees, Shirley McAdoo, Robert Pittman, and David Senseman, and an experienced health-care lawyer with whom Walsh consulted, Irwin Cohen, all of whom have provided testimony showing that Walsh knew during 1992–1996 that code E0277 was the wrong code for the ROHO Mattress Overlay. App. 643–648 (Defendants' Responses to Plaintiff's First Set of Interrogatories, Interrogatories Nos. 2 and 6, served November 2, 2000); App. 649–659 (Defen-

**D. Medica–Rents's Billings Under Code E0277**

**1. Winter 1993–94: Medica–Rents Begins to Submit Claims Under E0277**

In October 1993, Medica–Rents received five separate letters from the Louisiana carrier (prior to the DMERC's consolidation) in connection with claims submitted for various Medicare beneficiaries stating:

> We have found more can be allowed on the services. More is being allowed because more data was received. You will receive an explanation of medicare benefits/remittance advice soon.
>
> The procedure code for this service, E1399 and E0192, was changed to code E0277, in order to allow payment.

(Defs.' App. at 168; 800–821.)[33] In her deposition, Mary Edwards, R.N., the Medical Review Manager for Louisiana Medicare Services, testified that she made the decision to changes these claims submitted under E1399 to E0277. (Defs.' App. at 163.) She testified that the decision to make this change was not initiated by Medica–Rents and that she made her decision "[u]sing what [she] had at hand in the way that [her] desk procedures were written for miscellaneous codes and for the information attached to the claims that [she] actually sought review, the information that [Medica–Rents] submitted gave [her] a clear idea of what they were billing for."[34] (Defs.' App. at 163.)

After receiving these letters, Karen Mayes,[35] Medica–Rents's assistant office manager, claims that she contacted Louisiana Medicare to verify that it was appropriate for them to use code E0277 on future claims. (Mayes Dep., Defs.' App. at 356, 358–62, 377.) She testified that she spoke with a man who identified himself as a member of the team assisting with the transition to the Palmetto DMERC, and that he told her to use code E0277 when submitting claims for the ROHO Mattress Overlay. (Mayes Dep., Defs.' App. at 356, 358–66.) Mayes testified that she spoke with him on at least two occasions to verify this information and thinks "that at some point [she] actually faxed him information to be sure that he was referring to the same product." (Mayes Dep., Defs.' App. at 356–66, 372–73.)

---

dants' Responses to Plaintiff's First Set of Document Requests, Request Nos. 7 and 12, served November 2, 2000). Similarly, defendants omitted these individuals from their list of "key persons" in this case. App. to Def. Mem. 1a. (Pls.' Resp. at 4, fn. 3.)

**33.** The plaintiffs claim that this statement was "neither 1) a determination that code E0277 should be used for billing the ROHO Mattress Overlay, 2) an instruction to Medica–Rents to use code E0277 for billing the ROHO Mattress Overlay, nor 3) a determination that the allowable for code E0277 was appropriate for the ROHO Mattress Overlay." (Pls.' Mot. at 20.) In support of this, the plaintiffs point to the testimony of Mary Edwards, who worked for Arkansas Blue Cross Blue Shield in 1993 and had personal involvement in deciding what code Medica–Rents could use when billing Medicare for the ROHO Mattress Overlay. (Pls.' App. at 106.) The plaintiffs further al-

lege, based on the testimony of Edwards, that Louisiana Medicare decided that code E0277 could be used to allow payment for a few of Medica–Rents's claims in part because Medica–Rents described the product in claim forms as the "ROHO air flotation mattress system," and not as an overlay. (Pls.' App. at 109–115.) Edwards also testified that the Louisiana Medicare did not have authority to establish HCPCS codes. (Pls.' App. at 111.)

**34.** Under questioning by the plaintiffs, Edwards also testified that she thought the ROHO Mattress Overlay was the mattress on a low-air-loss bed and that if she had known that it was not, then it probably would not have qualified under the E0277 code. (Defs.' App. at 165.)

**35.** Walsh testified that he did not inform Craig or Mayes of his failed efforts to obtain approval to use code E0277 in 1992 or 1993. (Pls.' App. to Resp. at 517.)

Upon receiving this confirmation, Mayes contacted the local carrier in Texas, Blue Cross/Blue Shield of Texas, to inquire if Medica–Rents could use code E0277 for billing purposes when filing claims with them in Texas pending transition to Region C DMERC. (Mayes Dep., Defs.' App. at 361, 388.) Mayes testified that Debbie Medford of Blue Cross/Blue Shield of Texas informed her that Medica–Rents could not use code E0277 in Texas. (Mayes Dep., Defs.' App. at 361; Craig Dep., Defs.' App. at 20–21.) Furthermore, Craig testified that the local carrier in Tennessee also informed Medica–Rents that they could not file under code E0277 for the ROHO Mattress Overlay. (Craig Dep., Defs.' App. at 21.)

In several calls with Palmetto on various topics following the January 1994 transition, Mayes informed Palmetto's employee representatives that she had previously been instructed by the local carrier in Louisiana to use code E0277 in billing for the ROHO Mattress Overlay.[36] (Mayes Dep., Defs.' App. at 374–76.)

Craig, who also called Palmetto during January 1994, claims that Palmetto advised both her and Mayes that Medica–Rents should continue to use code E0277 when billing for the ROHO Mattress Overlay. (Craig Dep., Defs.' App. at 22–24, 27–29.) Medica–Rents also had obtained information from Crown Therapeutics, ROHO's supplier subsidiary in Kentucky, that Palmetto had instructed Crown Therapeutics to continue to use code E0277 when submitting claims for the ROHO Mattress Overlay. (Defs.' App. at 486–506).[37]

In addition, on December 7, 1993, Debra Harrington, a former SADMERC helpline representative and HCPCS reviewer, wrote a letter to Rabson Medical Sales, LTD that stated:

This is in response to our recent telephone conversation regarding the correct HCPCS code for the Jay Fluid Mattress.[38] The product information on this

**36.** Mayes also testified that she did not inform the people at Palmetto that the local carrier in Texas had instructed Medica–Rents not to bill for the ROHO Mattress Overlay under code E0277. (Mayes Dep., Defs.' App. at 376.)

**37.** With respect to the defendants' claims that Palmetto DMERC instructed Debbie Craig and Karen Mayes to use code E0277 for ROHO Mattress Overlay claims, the plaintiffs disagree, stating:

Ms. Craig and Ms. Mayes have provided contradictory testimony regarding their phone calls in the fall of 1993 and early 1994. The upshot of this contradictory testimony is that 1) the Palmetto DMERC did not instruct Medica–Rents to switch from code E1399 to code E0277 when submitting claims to the Palmetto DMERC, 2) Ms. Craig and Ms. Mayes incorrectly described the product as a mattress and not an overlay, 3)defendants did not seek coding guidance from the entity responsible for providing coding advice to suppliers, and 4) neither Ms. Craig nor Ms. Mayes ever informed the Palmetto DMERC that the local carriers in Texas, Tennessee, Ar-

kansas, and Alabama did not allow Medica–Rents to use code E0277.
(Pls.' Resp. at 20.) Furthermore, the plaintiffs dispute the defendants' assertion that the actions of the Louisiana and Kentucky Medicare carriers justified Medica–Rents's use of code E0277. The plaintiffs claim that Medica–Rents knew that the Louisiana Medicare carrier did not have accurate information when it decided to use code E0277 to allow for payment for the ROHO Mattress Overlay. The plaintiffs also claim that the Kentucky Medicare carrier's determination to allow Crown/ROHO, Inc. to use code E0277 was neither appropriate nor reliable. (Pls.' Resp. at 18.) The plaintiffs claim that in 1992 and 1993, the carriers in Texas, Tennessee, and Arkansas, where Medica–Rents conducted 92.3% of its Medicare business, did not allow Medica–Rents to use code E0277. (Pls.' Resp. at 18.)

**38.** The Jay Fluid Mattress, later known as the RIK Mattress, is a "non-powered, fluid, pressure and shear relief product designed and tested to provide pressure and shear relief for patients at high risk for pressure wound

product has been received and reviewed.

As I explained to you on the telephone, the Medical Directors of the four DMERCs (Durable Medical Equipment Regional Carrier) are currently reviewing the policy for mattresses and overlays. The resulting decisions, from this review, will be released to all suppliers by the DMERCs as soon as possible after the review is complete.

The correct code to use at this time remains E0277. Should the Medical Directors determine that another existing code or a new code is more appropriate, the information will be passed along to suppliers and providers by the DMERCs.

(Defs.' Supplemental App. at 1.) [39]

In May 1994, relator Ramon Carter,[40] who was working as a consultant for Medica–Rents, allegedly called Dan Anderson [41] for advice on what code to use when billing for the ROHO Mattress Overlay. (Defs.' App. at 3–4.) Dan Anderson, who served on a Palmetto Advisory Committee con-

tacted his acquaintance Cheryl Heller, the Texas Palmetto ombudsman. Anderson claims that Heller confirmed that E0277 was an appropriate code for billing for the ROHO Mattress Overlay. (Defs.' App. at 3–6.) [42] Heller, however, claims that she has no recollection of telling Anderson this and states that "any such advice would have been contrary to [her] understanding at the time." (Pls.' App. to Resp. at 662.)

In August 1994, McCausland, the administrative manager for Crown Therapeutics/ROHO, had a conference call with Richard Walsh. McCausland, documenting his conversation with Walsh in a memorandum to Graebe, owner and a founder of ROHO, Inc., wrote:

The key point of discussion regarded our letter to Dr. Tallon of June 7, 1994 where we attempted to outline how we felt the allowable for K0155 should be structured. In this letter we mentioned that a "Medicare allowable for K0155 of about $500.00 per month ... is appropriate for products in this code." It is

---

breakdown, patients with multiple Stage II pressure wounds, patients with Stage III and Stage IV pressure wounds, and patients with post surgical skin flaps and grafts, all without the need for electrical power, maintenance and service required with the powered air products." (Defs.' App. to Response to Pls.' Mot. for Partial. Summ. J. ("Defs.' App. to Resp.") at 78.) It was "designed to replace the current medical mattress and be used on existing medical bed frames." (Defs.' App. to Resp. at 79.)

**39.** In a letter dated March 27, 1995, to the vice-president of the company that manufactured the RIK Mattress, Godfrey, manager of the HCPCS unit at SADMERC, stated:

Until the Durable Medical Equipment Regional Carriers (DMERCs) finalize the new Support Surfaces Medical Policy they have decided any support surfaces products that do not meet the existing HCPCS codes be filed under E1399, Durable Medical Equipment, miscellaneous.

(Pls.' Suppl. App. at 3; *see also* Pls.' Suppl. App. at 4.)

**40.** Carter claims that he does not think that he asked Anderson to find out about the correct code for the ROHO Mattress Overlay until early 1995. (Pls.' App. to Resp. at 36–37, 39.)

**41.** Anderson is currently employed by Medica–Rents. (Pls.' Resp. at 33.)

**42.** The plaintiffs dispute the defendants' implication that all HCFA and Palmetto employees were familiar with the characteristics of the ROHO Mattress Overlay. The plaintiffs "concede that HCFA's Alpha–Numeric Workgroup, employees in the SADMERC, and the DMERC Medical Directors were familiar with the characteristics of the ROHO Mattress Overlay. All of these individuals determined that code E1399 was the correct code for the ROHO Mattress Overlay between 1993 and 1996." (Pls.' Resp. at 19.) "However, other Palmetto employees, including Sheri Thompson and Pat Smith–Wilhelm, were not familiar with the characteristics of the ROHO Mattress Overlay." (Pls.' Resp. at 20.)

my understanding that Mr. Walsh opposes this position based on the following:

It was his understanding that we were communicating the desire for an $840.00 allowable.

He is currently billing and being reimbursed under E0277 at an allowable of approximately $683.00 per month.

A consultant of his in San Antonio (who is apparently on the advisory board for Palmetto—DMERC Region C) has suggested that his current billings and payments have set a precedent and that an allowable of approximately $683.00 is quite possible unless the manufacturer should request less.

As a result Mr. Walsh believes that we should send a follow-up letter to Dr. Tallon and the other DMERC's "clarifying our position" and attempting to minimize the "$500.00 per month" references in previous correspondence with medicare.

During our call I attempted to verbalize some other key points that I believe should be considered, however, these did not appear to carry any weight with Mr. Walsh. Those points are:

With a suggested retail price of $5000.00 we have no support for requesting an allowable commensurate with current allowables for E0277 (i.e. $683.00 approx.) let alone $840.00 which represents our current standard rental price....

. . . .

The current allowable for E0277 is an aberration and is certainly not based on the pricing structure for our product, or even low air loss overlays. When E0277 was originally created it was supposed to be designed for an alternating pressure mattress (i.e. Pegasus which has a retail price of $9600.00). Because the descriptor was vague it became subject to interpretation by local medicare carriers. Initially it was expanded to cover all powered mattress replacement systems (i.e. low air loss). Some carriers even extended it to other products that were therapeutically equivalent to the mattress replacement systems....

This therapeutic equivalence is how we gained approval from Medicare B in Kentucky to bill under E0277. Up to that point MedicaRents had never succeeded in getting approval to bill under E0277 from any of their local carriers. They utilized our success in Kentucky to gain approval in other states.

. . . .

The fact that we were given permission by some local carriers to bill under E0277 has no bearing on what we would be allowed to bill under via the DMERC's. As the transition to the DMERCs started I contacted Frank White, Ombudsman for Region C and a personal friend, and Dr. Tallon to discuss the issue. We pointed out that since there was no existing code for the ROHO Mattress System we, and MedicaRents, had contacted each local carrier to determine how we should bill our product. We explained that this had resulted in us billing under different codes in different states, and in some states prevented us from accepting assignment at all. The interim agreement that was reached allowed us to continue billing existing patients and accepting new patients under the code approved by the local carrier prior to conversion to the DMERC (i.e. E0277 in Kentucky, E1399 in Texas, etc.) In addition, we agreed that we would not expand our program to other states prior to the support surface policies being finalized....

While the current format in Region C has allowed us some "limited" access to E0277 it was never meant to be long

term. In addition, Region C only represents 25% of the United States, the other three regions have not allowed any billing by us under E0277. The focus of our efforts must be national in scope. The current "interim" structure with Region C sets no precedent for national coverage or pricing. In fact, I have avoided pointing out that Region C has allowed us to do some billing under E0277 when communicating with HCFA or the other DMERCs for fear that pressure would be applied for them to discontinue the practice, or even worse, implement post payment audits.

. . . .

Since our conference call on the 29th I have had discussions with other employees of MedicaRents and have found out some additional information which may clarify Mr. Walsh's position:

MedicaRents is billing all their states under E0277 regardless of what they had billed under via the local carrier. This is contrary to our agreement with Region C. I know that MedicaRents has had many conversations with Region C since my initial discussions with Frank White, however, they have not informed us of any expansion to our original agreement. In addition, you may recall that Dennis Dees called me during the spring to discuss how the conversion of Texas to the DMERC should be handled because they were billing the local Texas carrier under E1399. He was concerned regarding billing the DMERC under E1399 as he was already billing them under E0277 in Tennessee and, I believe, Mississippi. We came to no decision, however, I agreed that billing under E1399, with the Texas allowables, would put our position at risk. . . .

MedicaRents is taking assignment and billing under code E0277 for all patients with a single stage II ulcer located anywhere on the body. This is especially worrisome!

As I mentioned earlier it is difficult to get medicare to change even when the mistake is obvious. . . .

MedicaRents is not apparently billing for preventative patients, however, they are clearly taking advantage of an interim situation which allows for much more flexibility, and abuse, with regards to what patients qualify for coverage under E0277. . . .

I am quite concerned that Mr. Walsh's position is based on desires that are contradictory with our efforts to date and are directly tied to his expansion of billing under E0277 to all states he operates in and to all patients with any stage II decubitus. In our meetings with him in Dallas he stated that he would be satisfied with an allowable over $300.00 per month, now an allowable of $500.00 is not "asking for enough."

(Pls.' Sealed App. to Resp. at 741–45.)

2. The 1994–95 Investigation of Medica–Rents' Billings

In August 1994, Palmetto's Program Integrity Unit, after receiving a complaint, began an investigation of Medica–Rents's submission of claims for the ROHO Mattress System under code E0277. (Defs.' App. at 345.) The investigation was headed by Peggy Walker and focused on Medica–Rents's raising of its actual charges following the transition to Palmetto [43] as

---

43. With respect to this issue, the defendants state:

Upon learning that it was authorized to submit its claims for the ROHO Mattress System under code E0277, Medica–Rents raised its charge in the winter of 1993–94 related to its Palmetto claims to reflect its actual charges to hospitals and other cus-

tomers. Walsh II at 169–171 (App. 949). HCFA official Nancy Schmidt acknowledged in her deposition that a DME supplier is not prohibited from raising its charges to above the fee schedule amount. Schmidt Dep. III at 38–39 (App. 757). Defendants' expert Bernard Patashnik, a former high-ranking official at HCFA, also confirmed

well as whether the ROHO Mattress Overlay was being properly billed under code EO277. (Defs.' App. at 865–80.)

In a letter dated December 29, 1994, Peggy Walker, as representative for Palmetto (the Region C DMERC), sent a letter to Medica–Rents stating:

We selected you for review due to the irregularities in billing of the code E0277. Several beneficiary complaints have been received in regards to code E0277 product description versus the product that is in use in the home. Medicare needs to confirm what product you are providing under code E0277.

(Defs.' App. at 860.) Walker also requested that Medica–Rents send Palmetto specific information relating to the ROHO Mattress Overlay and indicated that she was performing an audit of the beneficiaries that Medica–Rents had served from September 1, 1994, to December 1, 1994. (Defs.' App. at 860.)

In a letter dated January 17, 1995, Craig, transmitting the information that Palmetto had requested, stated:

Medica–Rents was instructed by your representative during the transition period in January 1994 to submit all ROHO Claims under E0277. It was our understanding that all ROHO Claims would be submitted under E0277 until the new revised support surface regulations were published.

(Defs.' App. at 563.) During the winter and spring of 1995, Palmetto's Medical Review Department conducted a comprehensive investigation of Medica–Rents's claims under E0277.[44] In early February, each of Medica–Rents's E0277 claims were diverted from normal claims processing by means of a computer edit, so that each claim could be individually examined by Palmetto's Medical Review Department. (Defs.' App. at 865–78.)

In a letter dated February 21, 1995, to McCausland, administrative manager for Crown/ROHO, Inc., Deborah Geddings, the HCPCS coordinator for SADMERC, stated:

I am writing to you about your coding request for the nonpowered Adjustable Zone Pressure–Reducing Air Mattress overlay. The Durable Medical Equipment Regional Carriers (DMERCs) have reviewed and decided HCPCS code E1399—(not otherwise classified durable medical equipment) should be used for the billing of your product. You will need to give a complete description of this product when billing. However, once the Support Surfaces Medical poli-

that this business decision was not prohibited and was in fact commonplace. Patashnik Dep. II at 324–35; Edwards Dep. at 180–81 (App. 584, 165).

(Defs.' Mem. in Support of Motion for Summ. J. ("Defs.' Mot.") at 30, fn 12.) The plaintiffs, however, state:

In 1993, Medica–Rents submitted ROHO Mattress Overlay claims to Blue Cross and Blue Shield of Texas under code E1399, charged monthly $450 per overlay, and received monthly $70 to $94 per overlay. When it began billing Palmetto in December 1993, Medica–Rents switched to code E0277, increased its monthly charge to $840 per overlay in order to raise the charge above the allowable for code E0277, and received monthly, on average $467.59

per overlay. While defendants assert that Medica–Rents increased its charge to $840 "to reflect its actual charges to hospitals and other customers" ... in fact, in late 1993 Medica–Rents represented to its Medicare customers that its actual charge was $450.

(Pls.' Resp. at 21–22 (citations omitted).)

44. In 1995, McCausland's notified Crown/ROHO, Inc.'s Board of Directors that "[p]otential for a post payment audit of MedicaRents exists. If so it is not out of the realm of possibility that Medicare could demand that MedicaRents repay over $200 per E0277 claim filed. So far no post payment audit has been suggested." (Pls.' Sealed App. to Resp. at 755.)

cy is finalized, it may turn out that your product could fall under a new coding structure.

All coverage and pricing concerns should be addressed directly to the individual DMERCS.

(Defs.' App. at 224.) Robert Smith, president of Crown Therapeutics, Inc. faxed this letter to Richard Walsh on March 1, 1995. (Defs.' App. at 497–504.) After receiving the letter, Mayes testified that Medica–Rents called Palmetto in an attempt to clarify the billing situation. (Mayes Dep., Defs.' App. at 379–80.) She claims that Medica–Rents was "told to proceed with the 0277." (Mayes Dep., Defs.' App. at 380.)

On April 20, 1995, Mayes called Palmetto to determine why Medica–Rents's claims submitted under code E0277 for the ROHO Mattress Overlay were not being paid. She spoke with Earline Jackson, an employee in Palmetto's customer service department. Jackson informed Mayes that 0277 "wasn't for the ROHO Mattress." ˙(Defs.' App. at 121.) Jackson then told Mayes to call SADMERC to find out what code Medica–Rents should be using.

Mayes called Shannon Ross of the SADMERC and was told that the ROHO Mattress Overlay should be billed under code E0197.[45] (Defs.' App. at 121.) On that same day, Medica–Rents also apparently received a "copy of a letter from SADMERC that ROHO was being placed in E1399." (Defs.' App. at 924.)

On April 20 and 21, Medica–Rents apparently re-transmitted over 1700 open claims with the code E1399. (Defs.' App. at 382–83, 924.) Also on April 21, Elaine Myers, the manager of professional relations at the Palmetto DMERC, informed Mayes that code E1399 could not be used for capped-rental items. In response, Mayes sent Myers a copy of the February 21, 1995, SADMERC letter that had instructed ROHO, Inc. to use E1399 for the ROHO Mattress Overlay.

Palmetto began to deny many of the resubmitted claims. On April 27, Medica–Rents again called Palmetto to clarify the situation and discovered that Palmetto "customer service knew nothing about the 1399 code." (Defs.' App. at 925; see Defs.' App. at 384–85, 924–25.) Throughout the rest of April and into June, Medica–Rents had various conversations with Myers and Sherietta Thompson, the Palmetto Ombudsman for Texas suppliers, in an attempt to get their unprocessed claims paid. (Defs.' App. at 923–28.) Myers and Thompson informed Medica–Rents that they were working on correcting the errors in denying the claims and that Medica–Rents would receive further denials before the situation could be corrected. (Defs.' App. at 923–28.) In addition, Medica–Rents discovered that Palmetto had changed the code for some of the claims to E0186, which Myers admitted was incorrect. (Defs.' App. at 122–23, 173–74, 547, 926–29.)

---

45. With respect to this, the plaintiffs state:
Medica–Rents did not inform the SADMERC that E0277 was the correct code for the ROHO Mattress Overlay. Instead, in an effort to avoid billing under code E0197, Medica–Rents sent the SADMERC the February 21, 1995, letter from the SADMERC to Crown/ROHO, Inc. stating that E1399 was the correct code.... At no time did Medica–Rents even attempt to argue to the SADMERC the contentions it makes in this case that 1) since the ROHO Mattress Over-lay had been classified as a Group 2 support surface, 2) there was only one code for Group 2 support surfaces, E0277, and 3) therefore E0277 was the correct code for the ROHO Mattress Overlay. Nor did Medica–Rents ever tell the SADMERC that Medica–Rents had been instructed by the Palmetto DMERC to use code E0277, which is defendants' principal contention in this case.

(Pls.' Resp. at 12.)

**3. Late Spring 1995: Use of Codes E0277 and 1399**

On May 15, 1995, the National Coalition for Wound Care wrote a letter to the HCFA and the four DMERC medical directors that stated:

The National Coalition for Wound Care (NCWC) is a multidisciplinary coalition of organizations and associations dedicated to preserving and effecting quality care for patients at risk for or suffering from wounds of the skin. Over the past two years, the NCWC has been working closely with HCFA and the DMERC Medical Directors during the development and review of regional medical policies for support surfaces....

We are writing to express our concern that these important policies, which were targeted to be released first in March and then in June, appear to have become less of a priority to HCFA and the DMERC. To be clear, the lack of policies is having a serious impact on the wound care community....

Next there is the existing problem with the DMERC medical policies that are currently in effect. Prior to the establishment of the DMERCs, a HCPCS code was created "E0277—alternating pressure mattress," which was intended for a specific product to address the needs of patients with multiple and/or advanced stage wounds. Unfortunately this HCPCS code, like many others, was interpreted in various ways by local carriers regarding what products qualify for reimbursement under the HCPCS code and what the patient coverage criteria should be. Within the proposed support surface policy is language which would clarify the products qualifying for reimbursement and the clinical conditions that are reimbursable under E0277. Since these draft policies have not been finalized, the situation under code E0277 remains confusing.

To further add to the confusion, it appears that several DMERC offices and SADMERC have recently advised suppliers to submit claims for products that have been previously coded under E0277 into code E1399 (a miscellaneous code category). This is in direct conflict with written directives given by the Medicare operations branch in April, 1992 to all carriers. This written directive lists products that could be coded under E0277. No new written update to this product listing has occurred and this recategorization appears to be random and inconsistent....

(Defs.' App. at 541–42.) The NCWC requested that the HCFA bring "clarity and consistency" to these DMERC policies by finalizing the draft support surfaces policy. (Defs.' App. at 541–43.) Furthermore, in a letter dated May 18, 1995, which was sent to the medical directors of each of the four regional DMERCs, the Health Industry Manufacturers Association ("HIMA") stated:

The Health Industry Manufacturers Association (HIMA) would like to bring to your attention our members' concerns about the appropriate coding of low air loss products....

Unfortunately, the lack of policy is having a severe impact on the wound care community. Over the past six months, there has been a change in verbal instructions from the SADMERC on the appropriate codes to use for the billing of low air loss products. Previously, local carriers had instructed providers and manufacturers to use E0277; however, we are now told that E1399 is the appropriate code to use. Historically, the E0277 code was used for the filing of claims for powered dynamic support systems other than integrated beds....

We have grave concerns over the dramatic shift in direction of coding these

products. First of all, there is confusion and frustration on the part of both manufacturers and suppliers since there is not a verbal consensus by HCFA, the SADMERC or the DMERC staff on whether to use 1399 or E0277 to bill these products...

(Defs.' App. at 229–30; see Defs.' App. at 200–02.) In its letter, the HIMA suggested, until the new support-surface policy was finalized, either allowing low-air-loss products to be coded under E0277 or assigning them a temporary code. (Defs.' App. at 229–30.)

On June 15, 1995, representatives of the SADMERC, the four DMERCs, and Nancy Schmidt [46] of HCFA's Dallas Regional Office held a conference call to discuss the problem of coding low-air-loss products under E0277. Laura Godfrey and Deborah Geddings, both involved with the HCPCS of SADMERC, wrote minutes from this meeting that stated:

Support Surfaces—E0277 vs E1399— Per a morning conference call with the DMD's and HCFA CO a decision was made to allow those manufacturers/suppliers who have been filing their low air loss product under E0277 to continue to do so.

Secondly, those manufacturers/suppliers who have been told to file E1399 may begin using E0277 for new patients claims. The DMERCs will not accept requests for adjustments for previously

filed claims under E1399 even if the claim was denied.

Lastly, new inquiries should be told of the dilemma and advised they have a choice to file using either code.

It is critical that staff at the DMERCs, HCFA and SADMERC follow this same script.

(Defs.' App. at 250.)

On June 19, 1995, Debra Herrington of the SADMERC issued a memorandum instructing that low-air-loss-mattress and overlay products be coded using E0277 or E1399. (Defs.' App. at 888.) This memorandum was sent by Godfrey to Robin Robertson, the director of the professional relations department of the DMERC. (Defs.' App. at 207–08.) However, according to notes made by Mayes, she received a phone call from Geddings on June 23, in which Geddings stated that "E1399 code [was] still correct and valid until the new support surfaces policy comes out." (Pls.' App. to Resp. at 627.)

4. July 1995: The Palmetto DMERC Authorizes Medica–Rents to "Revert to Using Code E0277":

On July 11, 1995, a policies-and-procedures ("PAP") [47] meeting was held at the Palmetto DMERC to resolve some billing and claims-processing issues. At this meeting, the PAP committee decided that Medica–Rents [48] should be allowed to use E0277 to bill for the ROHO Mattress Ov-

---

46. From the summer of 1988 through January 1993, Schmidt was a Medicare Part B Policy Specialist. (Pls.' App. to Resp. at 666.) From January 1993 until the fall of 1997, she was a health-insurance specialist and participated in Medicare's oversight and supervision of Palmetto. (Id. at 666–67.)

47. The DMERC PAP committee met on a scheduled basis to address issues that needed clarification. (Defs.' App. at 210–11, 838, 841–45.)

48. Pat Smith–Wilhelm, the medical review manager at Palmetto and Walker's supervisor, testified:

[T]here was no reference to Medica–Rents at the July 11, 1995, PAP Committee meeting, 2) the PAP Committee's decision was to advise a supplier to use code E0277 for low air loss products, 3) the PAP Committee's decision was not a decision to change the four DMERC's February 1995 consensus decision that the ROHO Mattress Overlay should be billed under E1399, 4) if Medica–Rents did not supply a low air loss product, then the PAP Committee's decision

erlay until the new support-surface policy was finalized.[49] (Defs.' App. at 551–56, 885–86; Pls.' App. at 605–06.) Myers sent an email with a subject line titled "ear[50] on medicarents (031938001)" to several people, including Peggy Walker, that stated:

the ear on this supplier is still active. as we discussed in pap yesterday, Rodney's team will be correcting claims and processing under e0277 but he can't make the change or have the supplier switch to billing e0277 until the ear is deactivated. is it possible to have this done today as the supplier is waiting to transmit more claims.

(Defs.' App. at 889.)[51] After being notified of this decision, Walker objected and reasserted her view that the ROHO Mattress Overlay should be coded under E1399, rather than E0277, because the ROHO

mattress was not a low-air-loss product. (Defs.' App. at 890–91, 930–32.) Walker sent several emails to SADMERC and DMERC managers describing the features of the ROHO Mattress Overlay and to various Palmetto managers disputing the use of E0277 for the ROHO mattress.[52] (Defs.' App. at 850–58, 893, 898.) Ultimately, Palmetto determined that Medica–Rents should be allowed to bill for the ROHO Mattress Overlay under code E0277. (Defs.' App. at 550, 858–59.) In accordance with this decision, on July 17, Palmetto removed the computer edit that had diverted all of Medica–Rents's claims to be processed by hand and began paying Medica–Rents's claims under code E0277. (Defs.' App. at 858, 959.)

On July 18, Sherietta Thompson, the Palmetto ombudsman, sent a letter[53] to

---

did not apply to Medica–Rents, and 5) she understood Peggy Walker's emails to be discussing two different products—a low air loss product that was covered by the PAP Committee's decision and a non-low air loss product that was not covered by the PAP Committee's decision. (Pls.' Resp. at 23; App. to Pls.' Resp. at 542–52.)

**49.** This decision was based in part on Debra Harrington's June 19, 1995, memorandum. (Defs.' App. at 885–86.)

The plaintiffs, however, claim that this decision was "internally inconsistent, and mistaken, because" the ROHO Mattress Overlay was not a low-air-loss product and Sheri Thompson was not familiar with the ROHO Mattress Overlay. (Pls.' Resp. at 22.)

**50.** "The term ear refers to an 'Entity Action Record' which is a computer edit related to electronic claims processing instituted by the Medicare carrier to flag and divert certain types of claims or specific durable medical equipment suppliers." (Defs.' Sur–Reply to Pls.' Mot. for Partial Summ. J. at 1.)

**51.** The dateline on this email is either cut off or not readable.

**52.** Peggy Walker sent (or had forwarded) her emails to, or she discussed the situation with, various individuals, including: (1) Laura God-

frey, SADMERC's HCPCS Manager; (2) Patricia Smith–Wilhelm, medical-review manager for Palmetto; Elaine Myers, Manager of Professional Relations—Palmetto GBA; (3) Ann Archibald, vice-president for Palmetto DMERC operations; (4) Robin Robertson, Director Professional Relations—Palmetto GBA; and (5) David Pankau, Palmetto's Director of Operations who had chaired the July 11 PAP meeting. (Defs.' App. at 852, 892–904.)

**53.** This letter indicates that it was copied to: (1) Sue Pearcy, HCFA project officer in HCFA Dallas regional office; (2) Robertson; (3) Myers; (4) Smith–Wilhelm; (5) Pankau; (6) Stuart S. Kurlander, an attorney; and (7) Dave Sullivan, an attorney. (Defs.' App. at 765.)

However, Pearcy testified that she does not recall receiving the July 18, 1995, letter, and if she did receive it she would have given it to Nancy Schmidt. (Pls.' App. to Resp. at 399, 403–04.) Nancy Schmidt testified that the first time that she saw the July 18, 1995, letter was in December 2000 and that she was unaware until this time that Palmetto had instructed a supplier of an overlay to use a mattress code. (Pls.' App. to Resp. at 463–64.)

Medica–Rents's general manager, Dennis Dees, that stated:

> As a result of this meeting, it has been determined by Palmetto Government Benefits Administrators in accordance with the SADMERC that the Low Air-loss Mattresses and Overlay products should be coded using HCPCS code E0277. Therefore, effective immediately you may revert[54] to using code E0277 when billing for the nonpowered adjustable zone pressure-reducing air mattress overlay.... These instructions supersede any previous billing instructions provided by Palmetto GBA staff.

> When the Medical Policy for Support Surfaces is completed and released, you will receive further coding instructions for the above referenced products.

(Defs.' App. at 263–65.)[55] However, according to Thompson, she did not know that Medica–Rents had received the February 21, 1995, letter from the SADMERC to ROHO, Inc. stating that the ROHO Mattress Overlay should be billed under code E1399 when she wrote this letter. (Pls.' App. to Resp. at 507.) In addition, according to Schmidt, who was employed with HCFA, "[a]t no time, including from 1993 through 1996, has Palmetto had the discretion to instruct a supplier of a nonpowered mattress overlay to bill Medicare using a HCPCS code for an alternating pressure mattress." (Pls.' App. to Resp. at 667.)

In a letter to Medica–Rents dated August 4, Thompson of Palmetto further stated:

> Currently, you have been instructed to bill the nonpowered adjustable zone pressure-reducing air mattress overlay with HCPCS code "E0277" which requires a completed DMERC CMN 01.01 be sent with the claim.

(Defs.' App. at 662.)

5. Winter 1996: The Support Surfaces Policy is Adopted

The DMERC's Medical Policy for Support Surfaces was promulgated in late 1995, with an effective date of January 1, 1996.[56] (Defs.' App. at 312.) In a letter dated January 8 to ROHO, Inc., Godfrey wrote:

> This letter is to confirm that a new code is being established effective April, 1996. The new code description is:

> *Nonpowered adjustable zone pressure-reducing air mattress overlay*

> This code will be a Group 2 support surface with regards to DMERC policy. The code will be published and additional information will be provided in the March/April DMERC bulletins.

> The ROHO Dry Flotation Mattress System will be appropriately billed using this code. At this time, the product is appropriately billed using the miscellaneous code, E1399—*Durable Medical Equipment*, Miscellaneous. Claims received on or after January 1, 1996 will be processed and reviewed according to

---

54. According to Godfrey, SADMERC did not approve and was unaware of the instruction to revert to using code E0277 when billing for ROHO Mattress Overlay contained in this letter. Godfrey based her opinion on the fact that a SADMERC spreadsheet, dated July 19, 1995, indicated that no coding decision had been made yet pending the ROHO Mattress Overlay. (Pls.' App. to Resp. at 234–239.)

55. According to Paul Metzger, DMERC Medical Director of Region A, Thompson may have made a mistake when she wrote this letter because the ROHO Overlay Mattress is not a low air loss mattress. (Pls.' App. to Resp. at 385.)

56. According to testimony from Joel Kaiser, the policy became effective on January 1, 1996, but it was not used to process claims until April 1. (Defs.' App. at 312.)

the Pressure Reducing Support Surfaces–Group 2 policy recently published by the DMERCs.
(Defs.' App. at 273.) Code K0413, with a descriptor of "non powered pressure-reducing mattress overlay" was officially promulgated in March 1996. (Defs.' App. at 329.) In addition, the definition of code E0277 was changed to be a "powered pressure reducing mattress (alternating pressure, low air loss, or powered flotation without low air loss)." (Defs.' App. at 328–31.) On April 1, 1996, Medica–Rents began billing Palmetto for the ROHO Mattress Overlay under code K0413.

### 6. September 1997: Palmetto Decides Not to Pursue an Overpayment Action Against Medica–Rents

In approximately January 1996, the Program Integrity Unit reassigned primary responsibility for the Medica–Rents investigation to analyst Audrey Shivar. (Defs.' App. at 833, 970.) She obtained from the SADMERC a printout of all of Medica–Rents' claims for the ROHO Mattress Overlay that had been paid under code E0277. On September 9, 1997, she even drafted an overpayment letter which, if sent, would have demanded that Medica–RENTS repay Palmetto $2,113,547.37, the difference between the E0277 and the E1399 payment amounts. However, before sending the letter, Shivar consulted Geddings, the HCPCS Coordinator for SADMERC. Shivar summarized the results of their discussion in a computerized file entry, dated September 22, 1997, that stated:

> Analyst called Deborah Geddings, SADMERC HCPCS Coordinator, who indicated that as of 1/1/97, the ROHO

mattress in question was assigned code K0413. Claims before then—due to the definition of E0277 and clarification issues with support surface policy—were to be filed with the HCPCS the supplier thought best fit the item in question. She stated that E0277 would have been acceptable at that time.[57] Again, she mentioned the situation of the policy of support surfaces prior to 1/1/97.
(Defs.' App. at 10; *see also* Defs.' App. at 836.) As a result, Shivar determined, based on the information in the case file, that she was not going to proceed with the overpayment investigation.[58] (Defs.' App. at 831, 837; Pls.' App. to Resp. at 492–93.)

### II. SUMMARY–JUDGMENT STANDARD

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir.1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir.1990). Next, the Court must review the evidence on those issues, viewing

---

**57.** Geddings testified that she does not recall making this statement. (Pls.' App. to Resp. at 19.)

**58.** The plaintiffs claim that the "outcome of Audrey Shivar's investigation in September

1997 was neither that 1) payment to Medica–Rents under E0277 was appropriate, 2) there was no basis for issuing an interim overpayment letter to Medica–Rents, nor 3) Medica–Rents had not been overpaid." (Pls.' Resp. at 25.)

the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.,* 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer,* 874 F.2d 1085, 1089 (5th Cir.1989).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams,* 836 F.2d 958, 961 (5th Cir.1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.1992). Thus, parties should "identify specific evidence in the record, and ... articulate" precisely how that evidence supports their claims. *Forsyth v. Barr,* 19 F.3d 1527, 1536 (5th Cir.1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

To prevail on a motion for summary judgment, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Crescent Towing and Salvage Co. v. M/V Anax,* 40 F.3d 741, 744 (5th Cir.1994); *Lavespere,* 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the defendant must negate an element that would affect the outcome of the action. *See Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. If the defendant moves for summary judgment alleging no evidence to support an essential element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Teply v. Mobil Oil Corp.,* 859 F.2d 375, 379 (5th Cir.1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### III. ANALYSIS

#### A. False Claims Act

The False Claims Act states:

Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim [59] for payment or approval;

for money or property which is made to a

---

**59.** Claim is defined as "any request or demand, whether under a contract or otherwise,

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

. . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .

31 U.S.C.A. § 3729(a) (West 2003). Under all of these sections, the basic elements of a False Claims Act violation include proving that: (1) the claimant presented, caused to be presented, or conspired to have presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the claimant knew the claim was false or fraudulent.[60] *See United States ex rel. Wilkins,* 173 F.Supp.2d at 618.[61] In addition, most Courts, including those in the Fifth Circuit, require a fourth element: materiality.[62] "Liability for both a 'false claim' and a 'fraudulent claim' implicitly requires a showing that what makes the claim either false or fraudulent is material to the asserted claim of entitlement to receive money or property from the government." *United States ex rel. Wilkins,* 173 F.Supp.2d at 630.

■ The first disputed issue is whether the defendants submitted false or fraudulent claims. The term "false or fraudulent" is not defined in the FCA. The Court in *Mikes v. Straus,* 274 F.3d 687, 696 (2d

---

contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C.A. § 3729(c) (West 2003).

**60.** Some courts have also held that there is a damage element: that the United States suffered damages as a result of the false or fraudulent claim. *See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir. 1994); *United States v. Intervest Corp.,* 67 F.Supp.2d 637, 646 (S.D.Miss.1999). However, the "Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim." *United States ex rel. Wilkins v. North Am. Constr. Corp.,* 173 F.Supp.2d 601, 619 fn. 10 (S.D.Tex.2001) (citing *Rex Trailer Co. v. United States,* 350 U.S. 148, 152, 76 S.Ct. 219, 100 L.Ed. 149 (1956) ("there is no requirement, statutory or judicial, that specific damages be shown")); *see United States v. Miller,* 645 F.2d 473 (5th Cir.1981); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 20 F.Supp.2d 1017, 1047 (S.D.Tex.1998), *remanded from* 125 F.3d 899 (5th Cir.1997).

**61.** "A failure to raise a triable issue of fact as to any of these three elements justifies the summary judgment dismissal of [the plaintiffs'] claims." *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1000–01 (9th Cir. 2002) (citing *Hagood v. Sonoma Cty. Water Agency* 81 F.3d 1465, 1477–79 (9th Cir. 1996)). To survive summary judgment, the plaintiffs "must establish *evidence* on which a reasonable jury could find for the plaintiff[s]." *Id.*

**62.** The plaintiffs, however, believe that materiality is not a separate element and claim that "materiality is treated simply as a component of a false claim, or as a distinct part of a cause of action under the FCA." (Pls.' Resp. at 43.) After reviewing the case precedent, the Court concludes that materiality is a necessary element of a cause of action under the FCA. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460–61 (5th Cir.1977); *United States ex rel. Wilkins,* 173 F.Supp.2d at 619–630. *See also United States v. Southland Mgmt. Corp.,* 288 F.3d 665, 674–78 (5th Cir.2002), *rev'd en banc on other grounds,* 326 F.3d 669 (5th Cir.2003).

Cir.2001), discussed the definitions, stating:

> A common definition of "fraud" is "an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." *Webster's Third New International Dictionary* 904 (1981). "False" can mean "not true," "deceitful," or "tending to mislead." *Id.* at 819. The juxtaposition of the word "false" with the word "fraudulent," plus the meanings of the words comprising the phrase "false claim," suggest an improper claim is aimed at extracting money the government otherwise would not have paid. *See* Clarence T. Kipps, Jr. *et al., Materiality as an Element of Liability Under the False Claims Act,* A.B.A. Center for Continuing Legal Educ. Nat'l Inst. (1998), WL N98CFCBABA–LGLED B–37, B–46 ("[A] claim cannot be determined to be true or false without consideration of whether the decisionmaker should pay the claim—that is, a claim is 'false' only if the Government or other customer would not pay the claim if the facts about the misconduct alleged to have occurred were known.")

*See also United States ex rel. Watson v. Connecticut General Life Ins. Co.,* No. CIV.A. 98–6698, 2003 WL 303142, at *4 (E.D.Pa. Feb.11, 2003).

Based on a review of the record, the Court concludes that there is no genuine issue of material fact as to whether the defendants submitted false or fraudulent claims. Rather, it is clear that they did not. The government, in an oversimplification of the issue, claims that the "defendants' claims under E0277 were false because the ROHO Mattress Overlay was neither an alternating pressure mattress

nor ... a low air loss mattress," the two types of mattresses that the HCFA permitted to be billed under E0277. (Pls.' Resp. at 29.) The premise behind the government's position is that the official descriptor for code E0277 was "alternating pressure mattress." Because the ROHO Mattress overlay was not an alternating-pressure mattress, since it was neither powered nor a mattress, the government claims that the defendants' use of code E0277 was false. The government then states that the DMERCs also allowed low-air-loss mattresses, which are non-alternating pressure products, to be billed under code E0277. In other words, the government admits that certain products, such as low-air-loss mattresses, that did not meet the official descriptor definition for E0277 were also allowed to be billed under E0277.[63] Based on these facts, the government wants the Court to conclude that the defendants' use of code E0277 was false or fraudulent because the ROHO Mattress Overlay did not match the descriptor definition or another definition that was deemed acceptable by HCFA and the DMERCs.

However, this attempt by the government to simplify the issue of whether the defendants submitted false or fraudulent claims when billing for the ROHO Mattress Overlay fails to take into account the extremely convoluted factual history of this case and the complexities of the Medicare HCPCS coding and billing determinations. As noted by one Court, Medicare regulations are "among the most completely impenetrable texts within human experience." *Rehab. Ass'n v. Kozlowski,* 42 F.3d 1444, 1450 (4th Cir.1994); *see also DeWall Enters., Inc. v. Thompson,* 206 F.Supp.2d 992 (D.Neb.2002) (detailing a long history of contradictory coding instructions provided to a DME supplier). Although the

---

**63.** The plaintiffs claim that a low-air-loss mattress, like the alternating-pressure mattress, was another type of powered mattress. (Pls.' Resp. at 29.)

government disagrees, the facts are crystal clear on one point: the scope of code E0277 was, at best, unclear and ambiguous. This is evident by the contradictory instructions and guidance given by both HCFA, the Medicare local carriers, and Palmetto concerning code E0277 between 1992 and 1996. The confusion that existed during this time is exemplified by the statement of Kaiser, a high-level HCFA official, that there was general confusion about the identity of the items described by code E0277 shortly after the inception of the code. (Defs.' App. at 316; *see also* Defs.' App. at 237–49.) In addition, in a June 1994 letter, HCFA made a statement that it was unable to provide a definition for code E0277, and was looking to the finalization of the support-surfaces policy to provide clarification of the code's intended coverage. (Defs.' App. at 222–23.)

Although there is evidence that HCFA did try to ameliorate some of the confusion associated with code E0277, its efforts to do so were directed towards the local carriers.[64] Furthermore, the evidence clearly shows that SADMERC, the agency that the government claims had the authority to make coding decisions, authorized another manufacturer, Rabson Medical Sales, to bill for the RIK Mattress, which was similar to the ROHO Mattress Overlay in that it was also non-powered, under code E0277. This evidence directly contradicts the government's over-simplified and unsupported view that any claim filed under code E0277 for a product that was not an alternating-pressure mattress or a low-air-loss mattress was false or fraudulent. Instead, this evidence shows that it was unclear what products could be billed under code E0277 and that the defendants' use of code E0277 for the ROHO Mattress Overlay was not false or fraudulent, especially

since they were instructed to bill using this code. Furthermore, the evidence indicates that when the defendants billed for the ROHO Mattress Overlay under code E1399, the local carriers and Palmetto sometimes decided to pay the defendants for the overlay under code E0277. Again, the Court concludes that there are no material facts suggesting that the defendants, by submitting claims for the ROHO Mattress Overlay under code E0277, submitted false or fraudulent claims.

■■■■ Nor is there any genuine issue of material fact that the defendants knowingly submitted these false or fraudulent claims. "Merely submitting a false claim does not show the necessary scienter for fraud." *United States ex rel. Garibaldi*, 21 F.Supp.2d at 619. "The requisite intent is the knowing presentation of what is known to be false." *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir.2001) (quoting *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991). "[A] person acts 'knowingly' if he: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *United States v. Estate of Rogers*, No. 1:97CV461, 2001 WL 818160, at *3 (E.D.Tenn. June 28, 2001); *see* 31 U.S.C.A. § 3729(b) (West 2003)). "Congress specifically amended the False Claims Act to include this definition of scienter to make 'firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir.1998) (quoting S.Rep. No. 99–345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272).

---

**64.** For example, HCFA wrote a letter to the "RO DME Contacts" in April 1992 indicating that it believed that some carriers were incorrectly using code E0277. (Pls.' Resp. to App. at 560.)

The first issue as to scienter here is whether the defendants had actual knowledge that they could not bill for the ROHO Mattress Overlay using code E0277. After reviewing the evidence, the Court concludes that the defendants did not have such actual knowledge. To begin with, the overwhelming evidence demonstrates that the defendants believed code E0277 was an appropriate billing code. The parties both agree that Walsh believed that E0277 "fit" the ROHO Mattress Overlay because: (1) the descriptor for E0277 did not contain the word "mechanized" or powered; (2) the ROHO Mattress Overlay was an alternating-pressure product because when the patient moved the overlay alternated; and (3) the overlay provided therapeutic value to patients equivalent to that provided by powered products billed under E0277. (Pls.' Resp. at 5; Pls.' App. to Resp. at 345–347; 370.)

The plaintiffs claim that such belief, however, was implausible because: (1) the defendants knew that the ROHO Mattress Overlay was not an alternating-pressure mattress; (2) the defendants knew that E1399 was the correct code; and (3) any advice given by Palmetto was either internally inconsistent or based on incomplete information. Even assuming that the defendants knew that the ROHO Mattress Overlay was not an alternating-pressure mattress, the evidence is clear, as discussed above, that there was considerable confusion within Medica–Rents, the HCFA, the DMERCs, and the support-surface industry as a whole, regarding what support surfaces could be billed under code E0277. (Defs.' App. at 243, 318–27.)

Even assuming that the defendants knew they were to bill for the ROHO Mattress Overlay under miscellaneous code E1399, the evidence indicates that the defendants wanted to bill under a code that was more profitable and did not have to be processed by hand. Although the plaintiffs imply that by having such desires the defendants were trying to defraud the government, the evidence does not support the government's contentions. The evidence shows that Walsh became very frustrated and angry with Medicare at various times for not allowing him to bill the overlay under code E0277, that he ranted and raved about how stupid Medicare was, and that he made statements that Medica–Rents would go bankrupt if it could not bill using code E0277. Even assuming that all these things are true, such statements do not indicate that Walsh knowingly submitted false claims for the ROHO Mattress Overlay under E0277. Instead, they indicate the frustration and anger that any reasonable person would have experienced had he undergone a trial similar to Walsh's in trying to deal with the Medicare program. Any smart business person would naturally want his product to be properly billed under a code that would legitimately obtain him the most profit.

In trying to get the ROHO Mattress Overlay billed under a different code, the evidence indicates that Medica–Rents repeatedly sought direction on how to bill. There is no evidence that Medica–Rents billed for the ROHO Mattress Overlay under code E0277 when it was specifically told not to do so. Also, the evidence shows that in 1995, Palmetto specifically authorized Medica–Rents to use code E0277 when billing for the ROHO Mattress Overlay until it directed otherwise. How can the defendants be said to have knowingly submitted false claims to the government when the government directed that they be so filed? [65]

65. The defendants claim that the plaintiffs cannot establish that they knowingly submitted false or fraudulent claims because the government knew of and approved the defen-

The plaintiffs argue that Palmetto's authorization of code E0277 was based on misleading or incomplete information supplied by Medica–Rents and that certain individuals within Medica–Rents knew that the ROHO Mattress Overlay did not fall under code E0277. However, the evidence shows that many people within HCFA and Palmetto were aware of the product details associated with the ROHO Mattress Overlay. Although the plaintiffs dispute the defendants' assertion that all HCFA and Palmetto employees were familiar with the characteristics of the ROHO Mattress Overlay, the plaintiffs "concede that HCFA's Alpha–Numeric Workgroup, employees in the SADMERC, and the DMERC Medical Directors were familiar with the characteristics of the ROHO Mattress Overlay." [66] (Pls.' Resp. at 19.) There is no evidence

that the defendants intentionally withheld any information from these individuals.[67] All of the individuals with whom the defendants dealt were representatives of the United States government and the defendants can not be faulted for believing that they were all familiar with the ROHO Mattress Overlay after years of dealing with multiple government agents or employees in an attempt to determine the appropriate code to use when billing for the ROHO Mattress Overlay. The evidence clearly indicates that Medica–Rents and/or ROHO, Inc. sent detailed information on the ROHO Mattress Overlay to HCFA or Palmetto employees on numerous occasions whenever it was requested. There is no evidence that Medica–Rents sent incorrect or incomplete information concerning

dants' claims for payment under code E0277 before the claims were presented. (Defs. Mot. at 51.) Defendants have used this defense, known as the government-knowledge defense, in various courts to successfully argue that they did not knowingly make a false claim. *See, e.g., United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288–89 (4th Cir.2002) ("the government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation"); *Shaw v. AAA Eng'r & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir.2000); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir.1999).

The plaintiffs, on the other hand, argue that "evidence of government knowledge entitles a defendant to judgment as a matter of law only in very limited circumstances." (Pls.' Resp. at 39.) The plaintiffs claim that "[c]ourts have held that summary judgment for the defendant may be appropriate when the defendant was so completely candid, forthcoming and cooperative that the defendant cannot be said to have acted with the requisite knowledge" and that the defense does not apply in this case because the defendants acted through misrepresentations, concealment, and deception. (Pls.' Resp. at 39.)

The Court, however, need not decide whether the government-knowledge defense

applies in this case to bar, as a matter of law, the government's claims under the FCA against the defendants. Instead, the evidence allows the Court to conclude that the defendants are entitled to summary judgment regardless of whether the government's knowledge is viewed as just one factor of whether the defendants knowingly submitted false claims or a complete defense to liability. *See, e.g., United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682–83 (5th Cir.2003) (E.Jones, concurring).

66. The plaintiffs argue, however, that these individuals with knowledge of the characteristics of the ROHO Mattress Overlay determined that code E1399 was the correct code for the overlay. (Pls.' Resp. at 19.)

67. Although there is evidence that the defendants may not have explained the whole convoluted history relating to which carriers had allowed them to bill for the ROHO Mattress Overlay under which code, this evidence, without more, does not indicate that the defendants knowingly submitted, caused to be submitted, or conspired to submit false or fraudulent claims. It merely indicates that the defendants were actively trying to obtain permission to bill under a code that allowed them to make the most profit, which is not illegal.

the characteristics of the ROHO Mattress Overlay.[68]

But the plaintiffs argue that Palmetto did not have the authority to tell the defendants that they could bill for the ROHO Mattress Overlay using code E0277 and that the defendants knew that Palmetto did not have such authority. The plaintiffs claim that the defendants attended various educational workshops in 1993 through 1995 in which the suppliers were advised that "1) it was the responsibility of the SADMERC to assign HCPCS codes to DME products, and 2) the code assignment depended upon the consensus of all four DMERCs." (Pls.' Resp. at 26.) Even assuming this is true, the evidence shows that when the SADMERC was first created, suppliers expressed some confusion over SADMERC's purpose and role. (Geddings Dep.; Defs.' App. at 175.) Furthermore, in its September 1993 Supplier's Manual, which the Court assumes that Medica–Rents had a copy of, Palmetto states:

> When you need to communicate with Palmetto GBA you will contact the team assigned to you. This puts you in contact with the team that is familiar with your Medicare billing needs. This team concept fosters communication and a more direct relationship between suppliers and the DMERC, promoting a higher quality of service to you. You have the opportunity as a supplier to get to know the individuals who have taken responsibility for your claims. and inquiries.
>
> . . . .
>
> All incoming calls from beneficiaries and suppliers are handled by the Dedicated Work Teams. The team members answer coverage questions and specific questions regarding claim disposition. . . .
>
> Our team members can help you with coding and billing questions, allowed charge amounts, and medical coverage criteria.

(Region C DMERC Supplier Manual at 9.1; Defs.' App. at 111, 114.) According to this manual, the defendants were to contact Palmetto, the DMERC, and not SADMERC, when they had a coding problem. Thus, the evidence clearly establishes that it was unclear, at best, who had the authority to make coding decisions. In the midst of such uncertainty, there is no evidence upon which the Court or any reasonable jury could find that the defendants knew that Palmetto lacked the authority to make a coding decision.

The defendants were involved with the Medicare program at a time when it was undergoing major transition. Under the facts of this case, the Court cannot fathom how anyone, including the defendants, could possibly have understood all the changes that were taking place and which department or division was responsible for making what decisions. While there is evidence that Medica–Rents aggressively sought to maximize its profits by obtaining the greatest amount it could from Medicare when billing for the ROHO Mattress Overlay, that is to be expected from a for-profit and its behavior does not demonstrate that Medica–Rents knew it could not bill under code E0277. After reviewing the facts of this case, the Court is sure that the people involved with the Medicare billing program, especially during the time that it was undergoing the transition, had an incomplete understanding of their respective roles in the transition process. That confusion as to roles led directly to confusion as to appropriate billing codes.

---

**68.** In addition, the Court notes that Palmetto acted not only as the DMERC for region C, but also as SADMERC. Palmetto's dual role only contributed to the confusion that existed as to which agency had the authority to make which decisions.

Having concluded that the defendants did not have actual knowledge that they could not bill for the ROHO Mattress Overlay under code E0277, the next issue is whether the defendants acted in deliberate ignorance or reckless disregard of the truth or falsity of information that the ROHO Mattress Overlay could not be billed under code E0277. The plaintiffs claim that suppliers have a duty to familiarize themselves with the legal requirements for Medicare reimbursement, and to clarify any ambiguous or doubtful guidance they receive from Medicare carrier representatives. The plaintiffs further state that a supplier that fails to inform itself of the reimbursement requirements acts in reckless disregard of the truth of its claims. The plaintiffs claim that the evidence shows that Medica–Rents and Walsh knew that code E0277 did not apply to the ROHO Mattress Overlay and that E1399 was the correct code. By not clarifying the ambiguous or doubtful guidance they received from Medicare carrier representatives [69] to bill under code E0277, the plaintiffs assert that the defendants were acting with deliberate ignorance or reckless disregard.

As stated before, the evidence indicates that there was considerable confusion over what products could be billed under code E0277. Furthermore, the evidence clearly establishes that the defendants repeatedly sought advice on how to code the ROHO Mattress Overlay, and that they always followed the most current advice that they received. In addition, the evidence shows that the defendants, on many occasions, did seek clarification and did double-check coding advice that they received. The Court does not see what more can be expected of the defendants, except that they should be allowed to rely on advice they received from the government officials. There is no evidence that the defendants intentionally withheld information from the plaintiffs or purposely turned a blind eye to certain information in an attempt to file a false or fraudulent claim. Consequently, the Court concludes that there is no genuine issue of material fact as to whether the defendants acted with deliberate indifference or reckless disregard of the truth. They did not.

The defendants have proffered ample uncontradicted evidence supporting their contention that they held a good-faith belief that they could properly bill using code E0277. In light of this evidence, and the fact that Palmetto directly authorized them to bill using code E0277, the plaintiffs' unsupported allegations to the contrary do not raise a triable issue of fact sufficient to bar summary judgment. *See Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir.1995) (stating that summary judgment is appropriate even when mental state is at issue, so long as there are sufficient undisputed material facts).[70]

**69.** Specifically, the plaintiffs claim that "[t]he coding guidance in the July 18, 1995 letter was internally inconsistent because it stated that "**Low AirLoss Mattresses and Overlay** products should be coded using HCPCS code E0277." Therefore, effective immediately you may revert to using code E0277 when billing for the nonpowered adjustable zoned pressure reducing air mattress overlay." (Pls.' Resp. at 35.) The plaintiffs state that "Medica–Rents knew that the ROHO Mattress Overlay was not a low air loss product. Consequently, Medica–Rents knew that a determination that low air loss products could be billed under E0277, as reflected in the letter, did not apply to the ROHO Mattress Overlay." (Pls.' Resp. at 36.) In addition, the plaintiffs point to testimony by Dennis Dees that he was confused by the coding advice in the letter and thought that Medica–Rents should have sought a clarification of the coding guidance. (Pls.' Resp. at 36.)

**70.** The Court notes that the defendants also argue that they are entitled to summary judgment on the United States's separate FCA complaint because it is barred by the statute

## B. Common Law Unjust Enrichment and Payment By Mistake Claims

The defendant claims that the government's motion for partial summary judgment on its claims for unjust enrichment and payment by mistake should be denied and their motion should be granted instead because these claims are equitable and the United States has an adequate remedy at law.[71] The defendants, citing two cases,[72] claim that the FCA itself furnishes the United States an adequate remedy at law and that a plaintiff may not recover on equitable remedies when there is a sufficient remedy at law available. However, as noted by the Court in *United States ex rel. Purcell,* 254 F.Supp.2d at 79, "[u]nder Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead alternative theories of liability, regardless of whether such theories are consistent with one another." Since the Court has held that the defendants are entitled to summary judgment on the plaintiffs' claims under the FCA, the plaintiffs may now proceed on alternate theories of liability such as payment by mistake or unjust enrichment. *See id.; see also United States v. Rivera,* 55 F.3d 703, 712 (1st Cir.1995); *United States v. United Tech. Corp.,* 255 F.Supp.2d 779, 784–85 (S.D.Ohio 2003).

### 1. Payment By Mistake

 "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938). "No statute is necessary to authorize the United States to sue in such a case[; t]he right to sue is independent of statute." *Id.* "In a false claim payment dispute, the government is entitled to reimbursement for payments ... where it is shown: (1) payments were made (2) under the belief that they were properly owed; (3) that belief being erroneously formed; and (4) the mistaken belief was material to the decision to pay." *United States ex rel. Trim v. McKean,* 31 F.Supp.2d 1308, 1316 (W.D.Okla.1998); *see also Stone v. United States,* 286 F.2d 56, 58–59 (8th Cir.1961). To prevail on a claim of payment by mistake, the United States does not need to show that the defendants knew that the payments were mistaken. *See, e.g., United States v. Mead,* 426 F.2d 118, 125 n. 6 (9th Cir.1970).

 After reviewing the evidence, the Court concludes that there is a genuine issue of material fact whether the payments by the Medicare program to Medica–Rents were wrongfully, erroneously, or illegally paid. Consequently, none of the

---

of limitations because it was filed more than six years after Medica–Rents filed its last claims under code E0277. For the reasons stated in *United States ex rel. Purcell v. MWI Corp.,* 254 F.Supp.2d 69, 74–77 (D.D.C.2003), the Court refuses to grant the defendants' motion on this basis.

**71.** The defendants also argue that the United States should not be allowed to proceed with their equitable theories of liability because they have not first sought recovery by "[r]eopen[ing] its Part B Payment Determinations for Medica–Rents, as it is required to do by 42 C.F.R. § 405.841." (Defs.' Mot. at 63; *see also*

42 U.S.C. § 1395ff.) The Court, however, concludes that the United States is not required to pursue an administrative action before seeking an overpayment action under theories of unjust enrichment or payment by mistake for the reasons stated in the plaintiffs' response. (*See* Pls.' Resp. at 52–59.)

**72.** The defendants cite to *United States v. Job Resources for the Disabled,* No. 97 C 3904, 2000 WL 562444, at *4 (N.D.Ill. May 9, 2000), and *United States v. Hydroaire, Inc.,* No. 94 C 4414, 1995 WL 86733, at *6 (N.D.Ill. Feb.27, 1995).

parties are entitled to summary judgment on this claim.

### 2. Unjust Enrichment

 "The doctrine of unjust enrichment applies to situations where there is no legal contract, but where the person sought to be charged is in possession of funds which in good conscience and justice should not be retained, but should be delivered to the rightful owner." *McKean*, 31 F.Supp.2d at 1316; *but see United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603 (8th Cir.1999) (stating that, notwithstanding the existence of contract between the United States and provider, United States could recover under theory of unjust enrichment amount by which Medicare payments exceeded value of goods that provider supplied to Medicare recipients). The defendants argue that the plaintiffs cannot recover under an unjust enrichment theory because there was a contract between the parties. The plaintiffs, on the other hand, argue that Medica–Rents did not have a contractual relationship with Medicare, and consequently, the plaintiffs can recover under a theory of unjust enrichment. After reviewing the evidence and the case law, the Court concludes that a contract did not exist between Medica–Rents and the government. *See, e.g., Greater Dallas Home Care Alliance v. United States*, 10 F.Supp.2d 638, 647 (N.D.Tex.1998)(rejecting a preliminary injunction argument that Medicare participation agreements "are essentially contracts"); *United States v. Geri–Care, Inc.*, No. Civ. A. No. 89–5720, 1990 WL 9463, at

*3 (E.D.Pa. Feb.1, 1990), *vacated in part on other grounds*, 1990 WL 39301 (E.D.Pa. Mar.30, 1990) (rejecting the defendants' argument that the government's unjust enrichment claim should be dismissed because there was a contractual relationship between them and Medicare since the defendants failed to produce the alleged contract and the defendant was not a provider of services as defined under the statute); *see also Applied Pharmacy Consultants, Inc.*, 182 F.3d at 607–09; *Mem'l Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) (noting that Medicare providers, upon joining the Medicare program, "receive[ ] a statutory entitlement, not a contractual right"); *Maximum Care Home Health Agency v. HCFA*, No., 1998 WL 901642 at *5 (N.D.Tex.1998) ("a Medicare service provider agreement is not a contract in the traditional sense[;] [i]t is a statutory entitlement created by the Medicare Act"); *Germantown Hosp. & Med. Ctr. v. Heckler*, 590 F.Supp. 24, 30–31 (E.D.Pa.1983).[73] Consequently, the United States can bring a claim for unjust enrichment against the defendants. Moreover, because genuine issues of material fact exist whether the defendants were unjustly enriched in receiving payment for the ROHO Mattress Overlay at a rate that exceeded the value of the overlay, the defendants are not entitled to summary judgment on this claim.

### IV. CONCLUSION

Based on the foregoing, it is ORDERED that the United States's Motion for Partial

---

73. The defendants cite *United States v. Arrow Med. Equip. Co.*, No. Civ. A. No. 90–5701, 1990 WL 210601, at *4–*5 (E.D.Pa. Dec.18, 1990), (in support of their claim that the government cannot bring a claim for unjust enrichment against them because their relationship with Medicare is contractual. However, the court in this case, even after acknowledging that the relationship between some of the defendants and Medicare was contractual, refused to dismiss the government's claim for unjust enrichment because the claim was lodged against the individual defendants, who did not have a contractual relationship with Medicare, as well as against the corporation that had entered into the contract with Medicare).

Summary Judgment [doc. # 272–1] is DE-NIED.

It is further ORDERED that the defendants' Motion for Summary Judgment [doc. # 277–1] is PARTIALLY GRANTED in that the defendants are entitled to summary judgment on the plaintiffs' FCA claim.[74]

**74.** The Court will contact the parties by telephone in early October so that the trial in this cause can be rescheduled.